## HAMILTON ET AL. VS. FOWLKES ET AL.

Where a contract respecting real estate is in its nature and circumstances unobjectionable, it is as much a matter of course for courts of equity to decree a specific performance of it, as it is for a court of law to give damages for the breach of it.

A contract in writing between two settlers upon the unsurveyed public lands, that an agreed line dividing their respective improvements, shall be the permanent line between them, and that upon the sale of the public lands by the United States, and the purchase of their respective improvements, each will convey to the other, at cost, the land by each respectively purchased or secured, that might be found upon the survey to be within the improvement of the other, is *certain, fair in all its parts, for an adequate consideration, capable of being performed, and mutual and reciprocal*, and will be enforced in a court of equity.

Though an agreement in relation to land be not put upon the public records of the county where the land is situated, a subsequent incumbrancer or purchaser thereof, with notice of the agreement, will be bound thereby.

And so, although in such case, he have no actual notice, but has only heard that there was some agreement between the parties thereto in relation to their lands, yet if one claiming under such agreement be in the open and visible occupancy and cultivation of the land, it is sufficient to put the purchaser upon enquiry, and charge him with constructive notice.

Where a person claiming title to land under an agreement, not recorded, has been in the actual, open, and visible possession and occupancy thereof, and has been cultivating the same for several years, a subsequent purchaser will be held to notice, although he may not have had actual knowledge of such possession and cultivation.

*Appeal from Lafayette Circuit Court in Chancery.*

Hon. JOHN QUILLIN, Circuit Judge.

WATKINS & CURRAN, for the appellants. It is certainly good law, that a court will not enforce the specific performance of a contract, unless it is *certain, fair, and just*, in all its parts, and

a requisite of all such contracts is that the remedy must be *mutual* and *reciprocal*, for one party as well as the other. This agreement is not only "certain, fair, and just," but the remedy is *mutual* and *reciprocal*.

It is certainly true that this agreement does not show, upon its face, the exact quantity, or the particular description of the land to be conveyed by Carrington, or the aggregate amount to be paid by Hamilton.

But the true rule is, that if the agreement, either in itself or by reference to any other rule, furnishes the means of ascertaining the thing, or if the thing be not now certain, or capable of certainty; yet, if the rule be given by which it may hereafter be specified and reduced to certainty, the court will not refuse to decree a specific performance. *Vide Prater vs. Miller*, 3 *Hawk's* (*N. C.*) *Rep.* 628; 2 *Vern.* 416; 1 *Ves. Junr.* 135; 3 *Br. Chan. Rep.* 168; 3 *Ves.* 184; 1 *Mad. Chan.* 136.

As regards the mutuality and reciprocity of the contract, we insist that the objections taken by Fowlkes are not tenable, for several reasons:

1. The two instruments being made at the same time, in relation to the same subject, constitute but one contract. It is a well established principle, that even in the absence of any positive proof to that effect, several instruments in writing, made at the same time, between the same parties, in relation to the same subject, will be construed as *one* agreement. *Strong vs. Burnes*, 11 *Verm. Rep.* 221; *Duncan vs. Charles*, 4 *Scam.* 561; *Reed vs. Field*, 15 *Verm.* 672; *Makepeace vs. Harvard College*, 10 *Pick.* 302; *Selby vs. Holden*, 10 *Pick.* 250; *Hunt vs. Livermore*, 5 *Pick.* 295; *Newal vs. Wright*, 3 *Mass.* 138; *Rodgers vs. Neeland*, 13 *Wend. Rep.* 114; *Jackson ex. dem. vs. Dunsbough*, 1 *Johns. Cas.* 91; *Stone vs. Tifft*, 15 *Johns. Rep.* 458; 2 *Con. Rep.* 218; *Watson vs. McKinney*, 3 *Wend.* 233; *McDowell vs. Hall*, 2 *Bibb* 60; 3 *Bibb* 11; 3 *Littell* 294; 4 *ib.* 319; 7 *Monr.* 347; 7 *Mass.* 496; 4 *ib.* 266.

If the two instruments in writing are to be construed as one,

we do not presume that any sane man will contend that the agreement was not *mutual* and binding upon both parties.

2. The instrument delivered to Hamilton, taken by *itself* without any connection with the one delivered to Carrington, shows upon its face a mutual and valid contract. It was signed by both parties, and shows that Hamilton was bound to take all the land on his side of the fence, and pay such price as it should cost Carrington. It is said that Carrington could not have compelled Hamilton to take the land and pay the cost; but we cannot understand why he could not do so. The legal effect of the instrument is the same as if Hamilton had expressly covenanted to take such part of his improvement as Carrington might enter, at the price it cost Carrington.

3. Carrington covenanted that the fence should be the permanent line; consequently, he and those claiming under him, would be estopped to claim any land on Hamilton's side; and as Hamilton signed the instrument in which Carrington recited that the fence had been established as the line, he would be estopped thereby, even though he did not make any express covenant to that effect. The estoppel would operate alike upon both.

Another conclusive answer to all the objections taken to this contract, is that it was an agreement for the *settlement of boundaries and conflicting* claims — the consideration being mutual on each side. The consideration of settling doubtful rights and boundaries, is not only good, but highly favored in law. *Zane's Devisees vs. Zane*, 6 *Munf.* 406; *Taylor vs. Patrick*, 1 *Bibb* 168; *Fisher vs. May's heirs*, 2 *Bibb* 448; *Mills' heirs vs. Lee*, 6 *Mon.* 97; *Mitchell vs. Long*, 5 *Litt.* 71; *Moore vs. Fitzwater*, 2 *Rand.* 442; 1 *Ves. Sr.* 444; 1 *P. Williams* 727; 1 *Atk.* 10.

We venture to assert, that no principle is more firmly established by the American authorities, than that actual possession of land, is, of itself, implied or constructive notice, to the whole world, of the title of the possessor. That a person who buys land is bound *by law* to know, whether he in *fact* knows or not, *who* is in possession of it at the time of his purchase — possession be-

ing sufficient to put a subsequent purchaser on inquiry as to the actual rights and nature of the claim *of such occupant*, and is constructive notice of the nature and extent of those rights. *Vide* 2 *J. J. Marsh.* 180,434; 1 *Litt. Rep.* 352; 4 *Monroe* 196; 1 *Monroe* 201; 1 *Smed. & Marsh.* 70, 443; 1 *Smed. & Marsh. Chan. Rep.* 338; *Freeman's Chan. Rep.* 85; 6 *Smed. & Marsh.* 345; 7 *Smed. & Marsh.* 456; 6 *Wend.* 213; 11 *Wend.* 442; 2 *Paige* 300; 3 *Barb. Chan. Rep.* 315; 2 *Mass.* 508; 3 *Mass.* 575; 6 *Mass.* 24; 10 *Mass.* 60; 1 *Pick.* 174; 3 *Pick.* 149; 4 *New Hamp.* 262; 2 *Ohio Rep.* 264; 1 *Stewart's (Ala.) Rep.* 233.

It is well settled, both in England and the United States, that actual and unequivocal possession *is notice*, not so much because possession is evidence of *actual* notice, as because it is the duty of one who is about to purchase real estate, *to ascertain by whom, and in what right it is held or occupied*, see *Sailor vs. Herlzog*, 1 *Wharton* 269; *Wood vs. Farmer*, 7 *Watts* 385; *Chesterman vs. Gardner*, 5 *John. Chan. Rep.* 29; *Macon vs. Sheppard*, 2 *Humph. Rep.* 335; *Hardy vs. Summers*, 10 *Gill & John's. Rep.* 316; *Burt vs. Cassity*, 12 *Ala. Rep.* 734; 8 *Ala. Rep.* 382; *Johnson vs. Gloney*, 4 *Black (Ia.)* 94; *Webster vs. Maddox*, 6 *Maine Rep.* 256; *Landers vs. Brant*, 10 *How. (S. C.) Rep.* 348.

*Fowlkes admits that he had notice of the agreement.* He admits that *before* he took the mortgage, he had *heard that some contract had been entered into between Hamilton and Carrington in relation to some lands situated, or supposed to be situated, in Lost Prairie, but of what character he could not ascertain.* Now this admission, of itself, is all that we ask to charge him with notice. Any notice sufficient to put a party upon inquiry is sufficient. *Sigourney vs. Munn*, 7 *Conn.* 324; 9 *Idem.* 286; 3 *Idem.* 146; *Pitney vs. Leonard*, 1 *Paige* 461; *Hawley vs. Cramer*, 4 *Cowen* 717; *Sugden on Vend.* 498; 1 *Atk.* 489; 2 *Atk.* 54, 174; 2 *Ves. Jun.* 440.

Thus, notice of a lease is notice of its contents. *Hall vs. Smith.* 14 *Ves. Rep.* 426.

PIKE & CUMMINS, for appellees. The first question in the case, is whether the agreement signed by Carrington was enforceable against him. The second whether, if it were, it is enforceable against Fowlkes.

It does not necessarily follow, because a contract is valid, and equity would not rescind it or relieve against it, that therefore it will decree it to be specifically performed. Sometimes damages may be recoverable at law for breach of a contract, of which equity would yet not decree specific performance; and sometimes damages may *not* be recoverable at law, and yet relief would be granted in equity. 2 *Story Equity*, sec. 741; *Weale vs. West Middlesex Water Works Company*, 1 *Jac. and Walk.* 370. The interference of courts of equity in this way, is discretionary. They will not so interfere, except where it would be strictly equitable to make decree for specific performance. If the parties have so dealt with each other, in relation to the subject matter of a contract, that the object of one party is defeated, while the other is at liberty to do as he pleases, in relation to that very object, equity will not grant relief, but will leave the parties to their remedy at law. 2 *Story Equity*, secs. 742, 750.

It will not decree specific performance, where, from a change of circumstances or otherwise, it would be unconscientious to enforce it. *Ib.*, sec. 751.

It requires a much less strength of case on the part of the defendant, to resist a bill to perform a contract, than it does on the part of the plaintiff to maintain it. The agreement must be CERTAIN, FAIR, and JUST, in all its parts. *Ib.*, sec. 769. The party applying for performance, must show that he has been in no default, and that he has taken all proper steps towards performing on his part. *Ib.*, sec. 771. A contract, to be specifically enforced, must be founded on a consideration valuable in contemplation of law. *Ib.*, sec. 793a.

The first great requisite of all such contracts, is that the remedy

must be MUTUAL and RECIPROCAL, for one party as well as the other. This rule is invariable. *Ib., secs.* 723, 790.

"The remedy here must be mutual for purchaser and vendor." *Withy vs. Cottle,* 1 *Sim. & Stu.* 174.

"It has been settled by repeated decisions, that the remedy in equity must be mutual; and that where a bill will lie for the purchaser, it will lie also for the vendor. *Adderley vs. Dixon,* 1 *Sim. & Stu.* 607.

In the present case, there was no contract on Hamilton's part to pay for the land, and no time of payment fixed. If, when surveyed and the lines run, it had been found that Carrington had title to only so much of the land within Hamilton's fence as was swampy, and of little or no value, he could not have compelled Hamilton to pay for it. If it had cost him $50 an acre, the latter could have declined paying that price.

If that be so, the contract is not mutual.

It is true, that " the settlement of boundaries, and peace and quiet, is a mutual consideration on each side; and, in all cases, makes a good consideration to support a suit in this court for settling boundaries," as Lord HARDWICKE said in *Penn vs. Lord Baltimore,* 1 *Ves. Sr.* 444. And where there is a contest as to boundaries, and a line is agreed on; or where there are conflicting patents, or citations, or claims to the land, and a division is agreed on, it will be maintained. *Ib. Cann vs. Cann,* 1 *P. Williams* 727; *Stapleton vs. Stapleton,* 1 *Atk.* 10; *Moore vs. Fitzwater,* 2 *Rand.* 442; *Zane's Devisees vs. Zane,* 6 *Munf.* 406; *Taylor vs. Patrick,* 1 *Bibb* 168; *Fisher vs. May's heirs,* 2 *Bibb* 448; *Mills' heirs vs. Lee,* 6 *Mon.* 97; *McIntyre vs. Johnson,* 4 *Bibb* 48; *Irvine vs. Scobee,* 5 *Litt.* 71.

But in this case there were no conflicting claims at all, nor any dispute about boundaries. It is a mere agreement on the part of Carrington that he would sell to Hamilton any part of the land in his possession which he might subsequently purchase.

But if the court should be of opinion that the agreement relied on in this case, was mutually binding on the original parties

23B

346        CASES IN THE SUPREME COURT

Hamilton et al. vs. Fowlkes et al.      [JULY

thereto, and that as between them, specific performance would be decreed; let us next examine whether such notice is established of Hamilton's equity, as will, under the circumstances, compel Fowlkes to perform.

Fowlkes absolutely denies any notice whatever, knowledge, suspicion, or belief, of the existence of the agreement, or of Hamilton being in possession of any part of the land, or of any part of it being included in his plantation, or within his fence, at any time. There is no proof whatever to the contrary, or in any degree shaking this explicit and unqualified denial.

But it is urged that the mere fact that Hamilton had in possession the land claimed under the agreement, was of itself notice, whether Fowlkes knew of that possession or not. This is the ground principally relied on.

The general doctrine as to *notice*, is thus stated by Chancellor KENT: "It is difficult to define, with precision, the rules which regulate implied or constructive notice, for it depends upon the infinitely varied circumstances of each case. The general doctrine is, *that whatever puts a party upon inquiry*, amounts, in judgment of law, to notice: *provided* THE INQUIRY BECOMES A DUTY, as in the case of purchasers and creditors, *and would lead to the knowledge of the requisite fact*, by the exercise of ordinary diligence and understanding. So notice of a deed is notice of its contents, and notice to an agent is notice to his principal. A purchaser with notice, from a purchaser without notice, can protect himself under the first purchaser, who was only authorized to sell, and a purchaser without notice, from a purchaser with notice, is equally protected, for he stands perfectly innocent. There is this further rule on the subject, that the purchaser of an estate in the possession of tenants, is chargeable with notice of the extent of their interests as tenants; FOR, HAVING KNOWLEDGE OF THE TENANCY, he is bound to inform himself of the conditions of the lease. So a purchaser of real estate cannot hold against a pure equitable title, *if he have notice of the equity before the payment of the purchase money, or the execution of the deed.*

STORY, in his *Commentaries on Equity Jurisprudence*, discusses the doctrine at far greater length. He says that where a person purchases with full notice of the legal or equitable title of other persons to the same property, he will not be permitted to protect himself against such claims, but his own title will be postponed and made subservient to theirs. It would be gross injustice to allow him to defeat the just rights of others by his own iniquitous bargain. He becomes, by such conduct, *particeps criminis* with the fraudulent grantor; and the rule of equity, as well as of law, is *dolus et fraus nemini patrocinari debent.*" *Sec.* 395. *The same principle* applies to cases of a contract to sell lands, or to grant leases thereof. *If a subsequent purchaser has notice of a contract*, he is liable to the same equity, and stands in the same place, and is bound to do the same acts which the person who contracted, and whom he represents, would be bound to do. *Sec.* 396.

He says again, quoting Lord HARDWICKE's remarks in *Le Neve vs. Le Neve, 3 Atk.* 646 : "That the taking of a legal estate, after notice of a prior right, makes a person a *mala fide* purchaser; and not that he is not a purchaser for a valuable consideration in every other respect. This is a species of *fraud* and *dolus malus* itself; *for he knew* the first purchaser had the clear right of the estate, and *after knowing that*, he takes away the right of another person, by getting the legal title."

And this exactly agrees with the definition of the civil law of *dolus malus.* "Now if a person does not stop his hand, but gets the legal title, *when he knows the equity is in another, machinatur ad circumveniendum.*" *Sec.* 397.

*Constructive* notice is, in its nature, no more than *evidence* of notice, *the presumption of which is so evident*, that the court will not even allow of its being controverted. *Sec.* 399. Whatever is sufficient to put the party upon inquiry, (that is, *whatever has a reasonable certainty as to time, place, circumstances, and persons,*) is in equity held to be good notice to bind him. "So, if a person should purchase an estate from the owner, KNOWING IT

TO BE IN THE POSSESSION OF TENANTS, he is bound to inquire into the estate which these tenants have; and therefore, he is affected with notice of all the facts as to their estates. *Sec.* 450.

We see, therefore, that according to the views of these eminent commentators, a prior equity prevailing against a subsequent purchaser with notice of it, does so on the ground that he has been guilty of a fraud : that he *machinatur ad circumveniendum:* that if there be no evidence of actual notice, there must be something which the law considers conclusive *evidence* of such notice, and that possession of a tenant is so, because, and only because, *knowing* the fact of their possession, the purchaser is bound to inquire, and held chargeable with a knowledge of the terms of their tenancies, which by inquiry he might have ascertained. Is this view as to the effect of possession sustained by the authorities? *Taylor vs. Stibbert,* 2 *Ves. Jr.* 440; *Daniels vs. Davidson,* 16 *Ves.* 249; *Hall vs. Smith,* 14 *Ves.* 426; 17 *Ves.* 433; *Crofton vs. Ormsby,* 2 *Sch. & Lef.* 596; *Hanbury vs. Litchfield,* 2 *Mylne & Keene* 629; *Eyre vs. Dolphin,* 2 *Ball & Beatt.* 301; *Walter vs. Maunde,* 1 *Jac. & Walk.* 181; *Allen vs. Anthony,* 1 *Merio.* 282; *Meux vs. Maltby,* 2 *Swanst.* 281; *Heirn vs. Mill,* 13 *Ves.* 120; *Miles vs. Langly,* 1 *Russ. & Mylne* 39; *Flagg vs. Mann,* 2 *Sumner* 555; *Hewes vs. Wiswell,* 8 *Greenl.* 94; *Hardy vs. Summers,* 10 *Gill & John.* 317; *Gouverneur vs. Lynch,* 2 *Paige* 300; *Chesterman vs. Gardner,* 5 *J. C. R.* 29; *Grimstine vs. Conter,* 3 *Paige* 421; *Prescott vs. Heard,* 10 *Mass.* 60.

The law requires proof of notice to be *clear.* "In order to fix this fraud, the proof of notice must be clear. *If it be merely doubtful,* a presumption of fraud will not be made." *Curtis vs. Lunn,* 6 *Munf.* 44.

The whole proof of notice in this case, is : 1st. Actual possession by Hamilton. 2d. Knowledge of the agreement by the settlers in the Prairie. 3d. That Fowlkes had heard that Hamilton and Carrington had made some contract about some lands in the Prairie, but could, on inquiry, learn nothing more; and 4th. That he never lived nearer the Prairie than Spring Hill, and how much further off is not known.

Mr. Chief Justice ENGLISH delivered the opinion of the Court.

This was a bill for specific performance, brought on the 2d December, 1847, in the Lafayette Circuit Court, by William F. Hamilton and others, devisees of *Robert Hamilton*, deceased, against *Edward B. Fowlkes*, a purchaser, and Priscilla S. Carrington and others, heirs at law of Robert Carrington, deceased.

The bill charges, that many years before the district of public lands situated in said county, and known as Lost Prairie, was surveyed, *Robert Hamilton* and *Robert Carrington* settled, enclosed, and cultivated, adjoining plantations in said prairie, which were separated by a dividing fence; and continued to possess and cultivate the same until they died, each holding undisputed possession of his improvement, and being considered the owner of the land enclosed by him, as against all persons except the government.

That after the lands were surveyed, it was found that the plantations were so situated, that neither Hamilton nor Carrington could, according to the legal subdivisions, enter the land included in his improvement without including a portion of the land embraced within the inclosure of the other. Whereupon, neither of them wishing to enter, or in any way interfere with the improvement of the other, and both of them desiring to adjust the difficulty, in a fair and equitable manner, it was mutually agreed between them, that when the lands came into market, each of them should proceed to enter and acquire title to the land including his own improvement, without regard to whether, in so doing, he encroached upon the improvement of the other or not; and that so much of any tract so entered by one, as should be included within the claim of the other, should be deemed to be for his benefit, and should be conveyed to him: it being understood that the fence then dividing their plantations, should be considered the true line, notwithstanding a part of the land claimed by one of them, should be entered by the other. And in pursuance of this agreement, and for the purpose of making it

binding, a memorandum thereof was reduced to writing, signed and delivered by the parties, each to the other, bearing date 29th May, 1842. That delivered to Hamilton, is exhibited, and is as follows:

"Memorandum of an agreement entered into, this 29th day of May, 1842, between Robert Carrington of the one part, and Robert Hamilton of the other part, *witnesseth*, that the fence which now divides and separates the plantations of the above said parties, thence a stright line to Red River, is, and hereafter shall be, a permanent line between the parties aforesaid. The said Robert Carrington hereby covenants and agrees with the said Robert Hamilton, that should he hereafter acquire any title by right of pre-emption, purchase, or otherwise, to any land lying in the plantation of the said Robert Hamilton, or within the line near the corner of the fence to Red River, in part of the plantation of the said Robert Hamilton, to make him a title in fee simple for the same, so soon as the said Robert Hamilton shall pay to the said Robert Carrington the cost of the aforesaid land. Witness our hands, this day and year above written.

*Signed:*　　　　　ROBERT CARRINGTON,
　　　　　　　　　ROBERT HAMILTON."

The bill alleges that the instrument delivered to Carrington was like the one copied above, except that the covenants to convey were made by Hamilton, the two instruments being mutual and dependant, one upon the other, and constituting but one agreement.

That afterwards, in pursuance of this agreement, Carrington purchased of the United States the *N. W. qr. of sec.* 2 *T.* 15, *S. R.* 26 *W.*, at $1 25 per acre; a portion of which tract was on Hamilton's side of the dividing fence, and had been for many years, and continued to be a part of his plantation.

That Carrington also, in pursuance of the agreement, caused the *N. E. quarter of sec.* 3, of the *same township and range*, to be selected and located for the State of Arkansas, as part of the 500,000 acres of land granted to the State by Congress for Inter-

nal Improvement purposes: and then purchased it of the State, under the act of 31st December, 1842, at $2 00 per acre, for which he executed his obligations, payable in ten annual installments, and obtained the Governor's certificate, covenanting to make him a deed on payment of the purchase money; a portion of which tract was also included in Hamilton's plantation.

That in like pursuance of said agreement, Hamilton entered, and obtained title to the *W. frac. half* of the *N. E. quarter* of said *sec. 2, west of Red River*, at $— per acre; a portion of which tract was on Carrington's side of the dividing line; and which part was purchased by Hamilton, for the use and benefit of Carrington, and was held by the complainants subject to said agreement.

On the 21st January, 1845, Carrington and wife conveyed his plantation, including the two tracts which extended across the dividing line into Hamilton's place, and forty slaves, in trust, to Hannah and Baldwin, to secure to Fowlkes the payment of a debt of $10,708 34, which Carrington owed to him, evidenced by notes dated the 16th April, 1841, due at one day, and upon which Pryor was security. The deed provided for the payment of the debt by installments in one, two, and three years, with power of sale to the trustees on default. It described the lands by the surveys, and "granted, bargained, sold, and conveyed" them to the trustees, &c., "with all and singular the houses and appurtenances thereunto belonging, all the right, title, and estate of the said Carrington and wife therein."

That in February, 1845, Carrington died, letters of administration upon his estate were granted to his widow, by the Probate Court of Hempstead county; who, on the 22d of January, 1846, obtained an order of said court, to sell all the right, title and interest of Carrington in the lands, &c., embraced in the deed of trust, for the payment of his debts. She made the sale in pursuance of the order, and Rust, the son-in-law of Carrington, became the purchaser of the plantation and slaves for $500, and obtained the deed of the administratrix therefor. Rust and wife, conveyed

them to Fowlkes, by quit-claim deed, on the 8th of June, 1846, for $8,626 54; and he entered into possession thereof, and claimed the whole of the lands, including the portions of the two tracts which extended into Hamilton's plantation; and which he, and his representatives had possessed and cultivated continuously, before and ever since they were surveyed, &c.

The bill further avers, that the line agreed upon as aforesaid, was always recognized and observed by Carrington, during his life, and by his heirs and legal representatives, after his death; and that it was the intention of Carrington to convey the lands by the deed of trust, subject to said agreement, and that such intent was manifested by the fact that he only conveyed his "right, title, and estate therein," without any express warranty; the true intent and meaning of the deed of trust, as understood by the parties thereto, being that Carrington conveyed his plantation, &c., lying north of Hamilton's; and that neither of the parties intended or believed that any part of Hamilton's plantation was conveyed by the trust deed; and that Fowlkes did not, at the time the deed was executed, believe or have the remotest idea that he thereby obtained or secured a lien upon any part of the lands, included within Hamilton's inclosure.

That in the summer of the year 1845, Hamilton died, having bequeathed his estate to complainants, one of whom had duly qualified and obtained letters as his executor, and taken possession of his plantation, for the purpose of paying his debts, &c., according to the provisions of his will, &c. That after Fowlkes had purchased the plantation of Rust, he paid the amount due upon the obligations given by Carrington to the State, for the *N. E. qr. of sec.* 3, and obtained the Governor's deed therefor, reciting Carrington's location and purchase thereof, and purporting to be made to Fowlkes, in consequence of the sale by the administratrix to Rust and of the conveyance of Rust and wife to Fowlkes, and the payment by him of the purchase money to the State. The deed of the Governor bears date August 3d, 1846.

That the fence dividing the two plantations had remained in

the same position it occupied when it was established as the permanent line by the agreement between Carrington and Hamilton, and all the lands south of the fence, and included within the plantation of Hamilton, had from thence continuously remained in the uninterrupted possession of Hamilton, or his executor, and a crop had been annually produced thereon by them: and that a portion of the $W$ frac. half of the $N. E.$ qr. of sec. 2, purchased by Hamilton, as above stated, was at the date of the agreement, and had continued since to be included in Carrington's plantation, and had been possessed and cultivated by Fowlkes ever since he obtained possession of said plantation.

The bill further alleges, that Fowlkes had refused to recognize or perform the agreement made between Carrington and Hamilton, pretending to be an innocent purchaser of the lands for a valuable consideration, without notice, &c., but complainants charge, that before he acquired any title to, interest in, or lien upon said lands, or entered into negotiation therefor, he, or his agent, well knew, or had reason to believe, that the lands claimed by complainant, were in the actual, uninterrupted, and undisputed possession, occupancy, and cultivation of Hamilton. That Fowlkes, or his agent, had been upon both of said plantations, had seen or knew where the dividing fence was situated, and knew, or had reason to believe that the plantation on the south side of the fence was possessed, claimed, and cultivated by Hamilton.

That in consequence of the lands in said Lost Prairie being valuable, and there being other planters, who had in like manner opened farms in that neighborhood before the lands were surveyed, between whom similar difficulties had arisen, which had been adjusted by similar agreements, it was a notorious fact, generally known and understood throughout that section of country, that such agreement had been entered into between Carrington and Hamilton, and that said fence was the established line, and that if any part of the plantation of one had been, or should be entered by the other, he would be entitled to have the same

354       CASES IN THE SUPREME COURT

Hamilton et al. vs. Fowlkes et al.       [JULY

conveyed to him, upon the payment of the entrance money ; and that Fowlkes, or his agent, before acquiring any title to, or lien upon the lands, had notice of such agreement, or had good reason to believe that it existed, &c., and that even if Fowlkes did not have such notice, he did not, when he acquired such title or lien, think or believe that Carrington's plantation extended south of the dividing fence, or that he, by any conveyance from, or under Carrington, acquired any interest in, or lien upon the lands south of the fence, and within the enclosure of Hamilton.

A plat of a survey of the lands is exhibited with the bill, showing the dividing line agreed upon between Carrington and Hamilton, and the quantity and boundaries of the lands entered by each, which extended into the plantation of the other.

That Fowlkes not only refused to perform the agreement aforesaid, but had brought an action of ejectment against the overseer of Hamilton's executor, for the possession of said *N. E. qr. of sec.* 3, and, on the 9th of July, 1847, obtained judgment by default, and was threatening to bring ejectment for so much of the *N. W. qr. of said sec.* 2, as was south of the line.

The bill further avers, that inasmuch as said lands were situated in the county of *Lafayette*, the Probate Court of Hempstead county had no authority to order the sale thereof by Carrington's administratrix; that the sale was illegal; and the legal title to the lands was in Carrington's heirs.

That part of Hamilton's improvement being upon the said *N. E. qr. of sec.* 3, it could not, under legal regulations, &c., have been entered by Carrington, but for the agreement between him and Hamilton.

That Hamilton, during his lifetime, was ready and willing, on his part, to perform said agreement, and his devisees and representatives had also been, were still, and offered in the bill to perform the same specifically, &c. That Fowlkes, though requested so to do, had refused, &c.

The bill prays that an account be taken of the cost of the lands

entered by Carrington and Hamilton, under the agreement, with an offer and tender of the amount which may be found due from Hamilton, and that the contract may be specifically performed.

A guardian *ad litem* was appointed for Carrington's minor heirs, and a formal answer interposed for them.

The answer of Fowlkes admits that Hamilton and Carrington settled, opened, and cultivated adjoining plantations upon the unsurveyed public lands in Lost Prairie, which were, and continued to be separated by a dividing fence, until their deaths; and were cultivated by them respectively, and those holding under them; and that each of them claimed to be the owner of, and to hold title to his plantation, against all persons except the United States. That after the lands were surveyed, such was the form of their plantations, that neither Hamilton nor Carrington could enter all the lands included within their respective plantations, according to the subdivisions, without purchasing some portion of a tract extending into the plantation of the other.

"The defendant has been informed, and believes it to be true, but does not know the same of his own knowledge, and does not admit the same to be true," that Carrington and Hamilton made, and entered into the agreement, in reference to the purchase of the lands, stated in the bill; and that, on the 8th day of May, 1842, they executed the written contract and agreement exhibited with the bill, but he insists that it was not such a contract for the sale of lands, &c., as Hamilton in his lifetime, or the defendant, could be required to execute and perform.

He had been informed, believed it to be true, but did not admit it, that at the same time another written agreement was executed by Carrington and Hamilton, similar to the one exhibited with the bill, in which the covenants to convey were made on the part of Hamilton, but he insists that they were not mutual and dependant, constituting but one contract, as alleged in the bill, but were separate and distinct agreements, &c.

He admits that Carrington did purchase of the United States, and obtain title to the *N. E. qr. of sec.* 2, at $1 25 per acre; and

contracted with the State for the *N. E. qr. of sec.* 3, at $2 00 per acre; but whether he made these purchases in pursuance of said agreement, defendant has no knowledge, information, or belief, other than what is contained in the bill.

He positively denies, that at the time Carrington and wife executed the mortgage to him, he knew, or had been informed, or had any reason to believe, that any such contract or agreement, as that alleged in the bill, had been made or executed between Carrington and Hamilton, in relation to the said *N. W. qr. of sec.* 2, and the *N. E. qr. of sec.* 3, as alleged in the bill, or that any part, or portions of said *sections two and three*, were in the plantation of Hamilton, or on the south, or any other side of any dividing line agreed upon between Carrrington and Hamilton; or that Hamilton then had, or pretended to hold any claim of any nature or character whatever, to the said *N. E. qr. of sec.* 3, and the *N. W. qr. of sec.* 2.

Admits that it may be true that Hamilton purchased the title to the *W. frac. half* of the *N. E. qr. of sec.* 2, but knows nothing of his own knowledge, and does not admit it to be true; but whether Hamilton purchased said tract, in pursuance of said supposed contract, defendant had never been informed and did not know, except from the statements in the bill.

Denies at the time he received the mortgage from Carrington and wife, he knew, or had been informed, or had any reason to believe, that the supposed agreement mentioned in the bill, had been made or executed between Hamilton and Carrington, in relation to the last named tract of land.

Admits the execution of the mortgage or trust deed, to him, by Carrington and wife; the death of Carrington, the grant of administration to his widow; the order of the Probate Court of Hempstead county, for the sale of Carrington's interest in the mortgaged property, to pay his debts, and the sale and conveyance thereof to Rust, as alleged in the bill.

Admits that on the 8th June, 1846, he purchased of Rust the plantation and slaves specified in the mortgage, and took the quit-

claim deed of Rust and wife therefor, entered into possession thereof, and had since held possession of the same, "except so far as certain portions of said *sections two* and *three* were adversely held by Hamilton in his lifetime, and are now adversely held by complainants." And insists that he is the owner of the whole of said *N. W. qr. of sec.* 2, and the *N. E. of sec.* 3, whether the same were in or out of the Hamilton plantation.

Has not been informed, and does not know whether supposed line charged to have been established by Carrington and Hamilton between their plantations, was always recognized by Carrington during his lifetime, and by his heirs and legal representatives since his death.

Denies that it was the intention of Carrington, in and by said mortgage, to convey said lands to defendant, subject to the supposed agreement, or that such intention is evidenced by the deed; Carrington and wife by the words "grant, bargain, and sell," having expressly covented with defendant, that they were seized of an estate in fee simple in and to said lands, free from incumbrance done or suffered by them.

Denies (again) that at the time the mortgage was executed, he knew, or had ever been informed, or had any reason to believe that any portion or quantity whatsoever, of the said *N. E. of sec.* 2, and the *N. W. of sec.* 3, was in the plantation of Hamilton, or that the same, or any other portion of the land specified in the deed, had been in the possession of, or claimed or cultivated by Hamilton, or those who claim under him ; but, on the contrary, defendant avers, that he then believed that Carrington held a good and valid superior legal title to the lands in the said deed specified against all persons, the State of Arkansas excepted; and that he, by said mortgage, obtained and secured a valid lien and charge upon all the lands therein specified.

Admits the death of Hamilton in the summer of 1845, the probate of his will, bequeathing his estate to complainants, and the possession of his plantation, &c., by his executor, &c., as charged in the bill.

Admits that after defendant had obtained from Rust and wife a deed for Carrington's plantation, and paid the State his obligations for the purchase money of the *N. E. quarter section* 3, defendant procured the Governor's deed therefor, as alleged in the bill.

Has no knowledge when the dividing fence, if ever, was agreed upon as a permanent line between the two plantations, nor how long it has occupied its present position. Admits that it was the dividing fence when he took possession of the Carrington place, and had so continued; and that Hamilton, and those holding under him, had annually made a crop on the Hamilton plantation, and had uninterrupted possession thereof, against all persons, as far as defendant knew or believed, until he sued for possession of the *N. E. of* 3.

Admits that he refused to recognize, and insists that he is not bound to execute, the supposed agreement between Carrington and Hamilton; that he is an innocent purchaser, for a valuable consideration, without notice of the supposed agreement, and avers that the mortgage was executed to him to secure a pre-existing debt, &c.

Denies that he, or his agent, had any notice, or reason to believe that the lands specified in the deed, and now claimed by complainants, or any portion thereof, had been, or were in the possession of Hamilton before, or at the time defendant acquired said lien, &c.

Denies that he, or his agent, had been upon the plantations, and seen or knew the locality of the fence, before he acquired title, &c., or that he had any knowledge, information, or belief, that Hamilton was in possession of, or cultivated the plantation on the south side of the fence; or that defendant knew, or had seen, or been informed, where any fence stood or was situated, which had divided, or was supposed to divide the plantations.

Denies all knowledge or information, as to whether other planters in that section had made similar contracts, or that difficulties

of like kind had arisen amongst them, or that the existence of such difficulties and agreements was notorious in the neighborhood, or that it was notorious there or elsewhere, that Carrington and Hamilton had made such agreement, or that the fence was the dividing line between their plantations, as alleged in the bill.

Denies also, that at the time he contracted with Rust for the equity of redemption, or received his conveyance, or paid him the purchase money, he, defendant, knew or had been informed, or received any intimation, or had any reason to believe or suppose that said agreement, or any agreement of the kind, had been made between Carrington and Hamilton, or that any portion of the land extended into Hamilton's plantation, or that any fence was the dividing line between them.

Admits that he had heard that some contract, but of what character he could not ascertain, had been made between Carrington and Hamilton, in relation to some land situated, or supposed to be situated, in or about Prairie.

Avers that he was never informed, or had any reason to believe, that any part or parts of the lands specified in the mortgage, extended into the plantation of Hamilton, until after defendant had purchased of Rust, when Rust, for the first time, informed defendant that a portion of the lands extended into the cultivated enclosure of Hamilton, and Rust then designated to defendant the said supposed dividing fence between the plantations.

Admits that the lands were situated in *Lafayette* county, and insists that if the sale, under the order of the Probate Court of *Hempstead* county, was irregular, defendant had a valid title, as against complainants, by virtue of his mortgage.

Insists that Carrington could have purchased the *N. E. of* 3 of the State, notwithstanding Hamilton's improvement thereon, regardless of said supposed agreement; and that defendant obtained the title from the Governor thereto, without any knowledge that Hamilton ever objected, or intended to object to its purchase by Carrington.

Insists that there is no equity in the bill; claims the benefit of

360          CASES IN THE SUPREME COURT

Hamilton et al. vs. Fowlkes et al.          [JULY

the statute of frauds, in relation to the agreement between Carrington and Hamilton; that he is an innocent purchaser, &c., and not bound thereby; interposes a demurrer, &c.

The cause was heard on the 1st November, 1850, upon bill and exhibits, answers, replications, and the depositions of Pryor, Crenshaw, and Finn.

The counsel agree, as part of the facts and evidence in the case, that on the 3d of June, 1848, one of the trustees named in the deed of trust from Carrington, (the other having died,) sold the lands and negroes mentioned in the deed, after due advertisement, at public auction, and that Fowlkes purchased at that sale for $15.000

And that after the bill in this case was filed, and process served upon Fowlkes, he filed in Lafayette Circuit Court his bill in chancery against the heirs and representatives of Carrington, setting forth the deed of Rust, and his two purchases, and praying decree for title thereunder, in which case, at October term, 1850, (30th October,) he obtained a decree confirming his title as against said heirs and 'representatives.

The plat of the survey of the two plantations, exhibited with the bill, shows that 75 20-100 acres of the *N. E. of* 3, and 68 80-100 acres of the *N. W. of* 2, purchased by Carrington, making in all 144 acres, extended across the dividing fence into Hamilton's plantation; and that 42 14-100 acres of the tract purchased by Hamilton, extended across the line into Fowlke's plantation.

Pryor deposed that he had known the two plantations ever since they were first settled by Carrington and Hamilton. His plantation adjoined Hamilton's. He was familiar with the dividing fence. It remained in the same position it occupied in January, 1842—had not been changed.

Hamilton, during his lifetime, and his representatives since his death, held possession of the land south of, and below the fence, and annually cultivated and raised a crop thereon, since January, 1842. Did not know whether Fowlkes, or any one representing him, was on said plantation prior to January, 1845. Be-

fore the survey of the lands in Lost Prairie, it was agreed between Hamilton and Carrington, in the presence of the witness, that said fence was to be the dividing line between their plantations ; that if, when the lands came into market, Carrington obtained title to any part of the land included within Hamilton's plantation or inclosure, he was to convey it to him, and if Hamilton acquired title to any within Carrington's enclosure, he was to convey it to him, each paying to the other such sum as the lands should cost. That the reason for making this agreement, was that it was supposed that when the lands were surveyed, one of them could not enter his own improvement by legal subdivisions, without including part of the improvement of the other. An agreement similar to this, for the same reason, was made among most of the planters, who owned improvements in that neighborhood. Could not say whether the existence of these arrangements and understandings was a matter of general notoriety or not, but it was known to all persons having improvements in said prairie. The agreement between Carrington and Hamilton was reduced to writing by the deponent, and is made an exhibit to the bill. A similar instrument was at the same time executed by Hamilton, and delivered to Carrington, with similar stipulations on the part of Hamilton in relation to the lands on Carrington's side of the fence. The agreement exhibited with the bill expresses substantially the understanding between Hamilton and Carrington, and was signed by them in the presence of deponent. The lands in the prairie are valuable.

Crenshaw deposed that he had been acquainted with the two plantations, and the position and course of the fence dividing them, since January, 1842. Had been in charge of the Hamilton place part of the time as an overseer—the fence had not been changed—Hamilton and his representatives had possessed and cultivated the lands south of, and below the fence, ever since January, 1842. It was the general understanding in the neighborhood, that all the planters in said prairie and vicinity, had, before the survey of the lands, entered into agreements that the

24B

fences dividing the farms should be the lines; and if one, in entering his improvement, in consequence of having to take it in legal subdivisions, should take part of the improvement of another, the other should have it. Witness was present when *Jett* made a survey of the said fence in the summer of 1847. He made two surveys, one at the request of Hamilton, and the other at the request of Fowlkes; and the fence then stood as it did in January, 1842, and as it has continued to stand since Fowlkes took possession of the Carrington place. Deponent never heard of any claim adverse to that of Hamilton's to the lands south of the fence, until after Fowlkes took possession of the Carrington plantation. Deponent knew nothing of Hamilton's title, other than that he was in possession.

*Finn* also proves the possession and cultivation of the lands south and below the dividing fence, by Hamilton and his representatives, for and during ten or twelve years prior to the time he deposes. Deponent owned a farm in said prairie before the lands were surveyed. It was generally understood, that such an agreement as that stated in the bill, had been made between Hamilton and Carrington, and it was generally understood that such agreements existed between all the planters in the neighborhood. Deponent had entered a large quantity of land in the said prairie, and when any of his land extended into the inclosures, or upon the improvements of any other persons, he held himself ready, and intended to convey the same to them—held himself ready to comply with the general understanding.

*Fowlkes* had been in possession of the Carrington place for two or three years. Deponent understood from Carrington, before the lands were surveyed, that it was agreed between him and Hamilton, that the fence should be the line between them.

Fowlkes never resided nearer the said prairie than *Spring Hill*. He never had any farm or settlement in the neighborhood, until he took possession of the Carrington plantation. After Carrington's death, Rust was in possession for about a year before Fowlkes took possession, and Fowlkes had a farm in Hempstead

county, not on the river. Prior to his taking possession of the Carrington place, he never had any farm on Red River until that time.

These depositions appear to have been taken 27th October, 1849.

The court was of the opinion that the said agreement was not binding and valid, as between the original parties thereto, for the want of mutuality; and that there was not sufficient proof of notice, to charge Fowlkes therewith, and dismissed the bill for want of equity.

Complainants appealed to this court. The validity of the contract between Hamilton and Carrington, and the sufficiency of the proof of notice to charge Fowlkes therewith, were the only questions submitted to the chancellor, and other matters were left to be settled by reference to the master, should the decree be in favor of complainants.

1. The first question to be determined, is whether the agreement between Carrington and Hamilton, was valid and binding upon them, and of a character that could have been enforced between them in equity?

Where a contract respecting real property is in its nature and circumstances unobjectionable, it is as much a matter of course for courts of equity to decree a specific performance of it, as it is for a court of law to give damages for the breach of it. And, generally, it may be stated, that courts of equity will decree a specific performance, where the contract is in *writing*, is *certain*, is *fair in all its parts*, is for an *adequate consideration*, and is *capable* of *being performed;* but not otherwise. 2 *Story's Equity*, sec. 751. The remedy must, also, be *mutual* and *reciprocal. Ib., sec.* 723, 790. The form of the instrument by which the contract appears, is wholly unimportant. *Ib., sec.* 751.

It is understood, of course, that there are verbal contracts respecting the sale of lands, which may be enforced in equity, notwithstanding the statute of frauds, but the consideration of such

364 CASES IN THE SUPREME COURT

Hamilton et al. vs. Fowlkes et al. [JULY

contracts, is not now involved, the agreement in this case being in writing.

*The contract must be certain* The written instrument must contain all its terms, so that the court may not be left to ascertain the intention of the parties by mere conjecture or guess, or to supply any of the terms of the contract by a resort to parol evidence, because the admission of such evidence would let in all the mischiefs intended to be guarded against by the statute of frauds. As, for example, where the memorandum of the contract does not show the price to be paid for the land, this omission, it seems, cannot be supplied by parol. *Parkhurst vs. Van Cortlandt,* 1 *John. Ch. Rep.* 280 ; 2 *Story's Equity, sec.* 767 ; *Blagden vs. Bradbear,* 12 *Vesey Jr.* 467.

Chancellor KENT, in *Parkhurst vs. Van Cortlandt,* said : "Unless the essential terms of the bargain and sale can be ascertained from the writing itself, or by a reference *contained in it,* to *something else,* the writing is not a compliance with the statute of frauds."

The master of the rolls, in *Blagden vs. Bradbear,* said : "The proposition, that the auctioneer's receipt may be a note or memorandum of an agreement, within the statute, is not denied : but for that purpose, the receipt must contain in itself, or by *reference to something else must show,* what the agreement was."

In *Prater vs. Miller,* 3 *Hawks Rep.* 628, the rule as to certainty in the contract, is stated thus: "A court of equity can afford no relief on a contract or agreement which is uncertain ; by this is meant, however, uncertainty in its *terms :* for when an agreement to do a thing, either in itself or by reference to any other rule, furnishes the means of ascertaining the thing, or if the thing be not *now* certain, or capable of certainity, yet if a rule be given by which it may hereafter be rendered certain, equity will interfere."

Testing the contract between Carrington and Hamilton by these rules, has it the requisite certainty ?

The quantity of land to be conveyed by one to the other, is

not stated in the agreement, but the contract furnished the rule by which the quantity could be easily ascertained in future. The fence was agreed upon as the dividing line between the two plantations. By reference to it, and the legal subdivisions of the public surveys, the number of acres of any tract purchased by one, which extended across the fence into the field of the other, could be readily determined, and thus the quantity of land to be conveyed by one to the other, under the terms of the contract, ascertained.

Nor is the *price* to be paid by one, for land conveyed to him by the other, stipulated in the contract, but it was agreed that it should be transferred at *cost*, by which the parties doubtless meant the entrance money, the lands being public, and thus the contract furnished the criterion by which the price could be easily determined.

The conveyances were to be executed by one to the other, after the entries, on payment of the purchase money, or cost of the land; the *time* of making such payment is not agreed upon, but the rule is, that where a definite time is not fixed for doing a thing agreed to be done, the court of equity will require it to be performed in a reasonable time. When it is said that parol evidence cannot be resorted to, to supply omissions in the *terms* of a written contract, it is not meant that such evidence is excluded as to the nature, locality, and circumstances surrounding the *subject matter* of the *contract*, and the situation of the parties entering into it. A full knowledge of these is often necessary, as in this case, to enable the court properly to interpret the contract, and ascertain the *intention* of the parties. 1 *Greenlf's. Evidence*, sec. 286, 287.

The agreement in this case, when interpreted in the light of the surrounding circumstances, existing at the time it was entered into by the parties, as established by the pleadings and evidence in the cause, contains no such want of *certainty* in its *material terms*, as to preclude a court of equity from enforcing its performance.

*The contract must be fair in all its parts.*   There is nothing in any feature of the agreement between Carrington and Hamilton, that does not appear to be fair, reasonable and just. The importance of, and the national and social advantages arising from, the opening, subduing and settlement of the uninhabited and wilderness districts of this country, and the hardships, deprivations and difficulties attending such settlements, have induced the policy of encouraging by legislation, the pioneer in the appropriation and occupancy of the public lands. Carrington and Hamilton, it seems, settled, opened, and put into cultivation, adjoining plantations, upon unsurveyed lands. Finding, when the lands were surveyed, that each could not enter the lands embracing his own improvement, by the legal subdivisions, without including a portion of the improvement of the other, they agreed upon a fence separating their places, as the dividing boundary line, and mutually covenanted that each would purchase, when the lands came into market, such tracts as his improvement covered, and then convey to the other at cost, so much of any such tract as extended into his plantation. It seems to us, that this agreement was fair, just, and highly commendable, and tended to prevent rivalry, contention, disputation, and perhaps litigation between them in their efforts to purchase and secure the lands embraced by their respective plantations.

"An agreement," says Judge STORY, (2 *Equity Com., sec.* 769,) "to be entitled to be carried into specific performance, ought (as we have seen) to be *certain, fair*, and *just, in all its parts*. Courts of equity will not decree a specific performance in cases of fraud or mistake, or of hard and unconscionable bargains; or where the decree would produce injustice; or where it would compel the party to an illegal or immoral act, or where it would be against public policy; or where it would involve a breach of trust; or where a performance has become impossible; and generally, not in any cases where such a decree would be inequitable, under all the circumstances."

It is not perceived that the agreement between Carrington

and Hamilton is subject to any of the objections above enumerated.

Moreover, *the contract must be upon an adequate consideration.* By which is meant, that it must be founded upon a valuable, or at least a meritorious consideration, for courts of equity will not carry into specific execution any merely *nude pacts* or *voluntary* agreements, not founded upon some valuable or meritorious consideration. 2 *Story Eq.*, sec. 787.

It will hardly be contended, that the situation of the parties, the motives which induced them to enter into the contract, as above stated, the advantages arising to each therefrom, and the inconvenience which might have resulted to them had they not made such agreement, do not furnish a sufficiently meritorious consideration to uphold it.

*The remedy upon the contract must be mutual.* It is manifest, from the deposition of Pryor, that the two instruments of writing, executed by Carrington and Hamilton, at the same time, in reference to the same subject matter, constituted but one contract, and contained mutual and reciprocal covenants to be performed by the parties. Each agreed to convey to the other, such portion of any tract of land entered by him as might extend into the plantation of the other, at cost; and, in this respect, there could be no pretence that the remedy upon the contract would not be mutual.

It is argued by the learned counsel for Fowlkes, that "in the present case there was no contract on Hamilton's part to pay for the land, and no time of payment fixed. If, when surveyed, and the lines run, it had been found that Carrington had title to only so much of the land within Hamilton's fence, as was swampy, and of little or no value, he could not have compelled Hamilton to pay for it. If it had cost him $50 an acre, the latter could have declined paying that price. If that be so, the contract is not mutual."

In reference to the time of payment, we have already remarked, that where no time is fixed for the doing of a thing agreed to

be done, equity will compel its performance within a reasonable time.

It may be further remarked, in reference to this part of the argument of the counsel, that an application to compel the specific performance of a contract is addressed to the sound discretion of the chancellor, and that each case must rest upon its own peculiar facts, (2 *Story's Equity*, sec. 742,) and is not to be decided by imaginary or supposititious cases presenting hardships. If the facts in this case were, as it is supposed by the counsel they might have been, the argument of want of mutuality would possess some force; but no such state of case is here presented.

It is manifest that the primary object of the parties, in making the contract, was to secure to each the unobstructed privilege of entering the lands embraced by his plantation, and then to convey to the other so much thereof as extended into his enclosure, and was cultivated by him, or designed for cultivation, and which he was desirous to have, willing to pay the entrance money for, and impliedly bound himself, by the terms of the contract so to do, on the making of the conveyance to him.

The validity of agreements, somewhat similar to the present, has been several times recognized by the decisions of this court. See *Cain vs. Leslie*, 15 *Ark. Rep.* 312; *Baker vs. Hollobaugh*, *ib.* 322; *Dickson vs. Richardson*, *January term*, 1855.

In *Zane's Devisees vs. Zane*, 6 *Munford* 406, the specific performance of a contract resembling the one now under consideration, in several of its important features, was decreed against some of the objections urged against the validity of the contract in this case.

All the features of the contract considered in connection with the surrounding circumstances established by the pleadings and evidence, we think it was valid and binding upon the original parties thereto, and such as a court of equity might well have enforced between them.

2. Do the pleadings and evidence make such a case, as to entitle the devisees of Hamilton to a decree for a specific perfor-

mance of the contract by Fowlkes, who holds the lands under Carrington?

Though the agreement was not upon the public records of the county where the land was situated, yet, if Fowlkes became the incumbrancer or purchaser thereof, with notice of the agreement, it is well settled that he is bound thereby.

On the other hand, it is equally well settled, that if he was an innocent incumbrancer or purchaser, for a valuable consideration, in good faith, without notice of the agreement, he is in no way to be bound, nor is he to be prejudiced thereby.

These are familiar rules of law, requiring no reference to authority to sustain them.

It is alleged in the bill, but positively denied, and not proven, that Fowlkes purchased with notice of the existence of the agreement.

It is also alleged that Hamilton and his representatives were in the actual and open possession of the land in controversy; that it was within his inclosure, constituted part of his plantation, and was annually cultivated by him and his representatives from a period anterior to the date of the agreement, until the filing of the bill. This is not denied by the answer of Fowlkes, and if it were, it is abundantly proven.

It is moreover alleged, positively denied, and not proven, that when Fowlkes obtained the mortgage from Carrington, and when he purchased the equity of redemption of Rust, he knew, or had good reason to believe, that Hamilton and his representatives were so possessed of the land.

It is submitted as a legal proposition by the counsel for the appellants, that Hamilton being in the actual and open possession of the land, is sufficient, though Fowlkes might not in fact have known it. That he was bound by law to take notice of Hamilton's possession, and enquire by what title he held the land. This proposition is disputed by the counsel for Fowlkes, and is the important issue in the cause.

The English, and the current of American authorities, warrant

370    CASES IN THE SUPREME COURT

Hamilton et al. vs. Fowlkes et al.    [JULY

the conclusion that if Fowlkes had *known* that Hamilton was in the actual and open possession of the land, that it constituted part of his plantation, and was, and had been for years, cultivated by him, this would have been sufficient to put Fowlkes upon inquiry, as to the nature and extent of Hamilton's title; and therefore, constructive notice of such title as he had. *Taylor vs. Stibbert*, 2 *Vesey Jr.* 438; 1 *Story's Equity*, sec. 400; *Daniels vs. Davidson*, 16 *Vesey Jr.* 249; *Haubury vs. Litchfield*, 2 *Mylne & Keen* 629; *Hiern vs. Hill*, 13 *Vesey Jr.* 114; *Flagg vs. Mann*, 2 *Sumner* 555; *Hewes vs. Wiswell*, 8 *Greenl.* 94; *Hardy & Talburtt vs. Summers and wife*, 10 *Gill & John.* 316; *Governor vs. Lynch*, 2 *Paige* 300; *Chesterman vs. Gardner*, 5 *John. Chan. R.* 29; *Tuttle vs. Jackson*, 6 *Wend.* 213; *Farnsworth vs. Childs*, 4 *Mass.* 639, and other cases cited by the counsel for both parties.

In *Flagg vs. Mann*, Judge Story said: "I admit that the rule in equity seems to be, that where a tenant or other person is in possession of the estate at the time of the purchase, the purchaser is put upon inquiry as to his title; and if he does not enquire, he is bound in the same manner as if he had enquired, and had positive notice of the title of the party in possession." He says, however, that the American courts have been reluctant to give effect to this doctrine of constructive notice from possession, even in its most limited form, referring to *Scott vs. Gallagher*, 14 *Serg. & R.* 333; *McMechan vs. Griffing*, 3 *Pick. Rep.* 149; *Hewes vs. Wiswell*, 8 *Greenlf.* 94, and further remarking that "These cases do, as I think, admonish courts of equity in this country, where the registration of deeds, as matters of title, is universally provided for, not to enlarge the doctrine of constructive notice, or to follow all the English cases on this subject, except with a cautious attention to their just application to the circumstances of our country, and to the structure of our laws." And he concludes that the purchaser is only put upon inquiry as to the title of the party in possession, and not as to the title of others, under whom he may hold, which it seems, from other cases cited above, is the correct rule.

Mr. KENT says: "It is indeed difficult to define, with precision, the rules which regulate implied or constructive notice, for it depends upon the infinitely varied circumstances of each case. The general doctrine is, that whatever puts a party upon inquiry amounts, in judgment of law, to notice, *provided the inquiry becomes a duty*, as in the case of purchasers and creditors, and would lead to the knowledge of the requisite fact by the *exercise of ordinary diligence* and understanding. There is, also, this further rule on the subject, that the purchaser of an estate, in the possession of tenants, is chargeable with notice of the extent of their interests as tenants: *for having knowledge of the tenancy*, he is bound to inform himself of the conditions of the lease." 4 *Com.* 179.

But to return to the point directly at issue: was it necessary to show that Fowlkes had *actual knowledge of the possession* of Hamilton?

In *Buck vs. Halloway's Devisees*, 2 *J. J. Marsh.* 180, Judge UNDERWOOD said: "The only sensible rule is, that actual residence upon the land, is notice *to all the world* of every claim which the tenant may legally assert in defence of his possession. It was in consequence of such residence, that we were induced to regard Buck as a purchaser with notice. Notice in such cases is a legal deduction from the fact of residence."

Nothing is said about Buck's knowledge of such possession, but the remark of the judge, that residence upon the land was "*notice to all the world*," would seem to imply that he considered the application of the rule to be general.

In *Knox vs. Thompson*, 1 *Littell* 351, the court said: "It is proven, that when the first deed was made to Thompson, and for some time previous thereto, Knox had part of the land in actual cultivation and possession, and has continued that possession and cultivation ever since. And were there no other evidence of notice, the mere circumstance of Knox being possessed of, and cultivating the land, would be sufficient to justify the inference of Thompson knowing of his claim before the date of his deed: *for*

it is not to be presumed that when about to purchase, *Thompson* failed to ascertain whether or not the land was under cultivation, and after finding Knox in the possession, he would naturally be induced, from the connexion that exists between the title and possession of land, to enquire for Knox's claim. If, however, after knowing, *as he must be presumed to know*, that Knox had the possession and cultivation of the land, Thompson failed to enquire for his title, he ought to be subject to all the consequences of a purchaser with notice; for the fact of the land being in the cultivation of Knox, was sufficient to put Thompson on the search for his claim, and any circumstance that puts another on the search, is sufficient to convict him of notice."

In *Barbour vs. Whitlock*, 4 *Monroe* 196, Chief Justice BIBB said : "Possession under an equitable claim, infects the purchaser of the legal title with notice of that equity." This rule is stated in general terms, but the facts of the case show that the ancestor of Barbour knew of the possession of Whitlock, and those under whom he held. See, also, 1 *Monroe* 201.

In *Dixon & Starkey vs. Doe ex. dem. Lacoste*, 1 *S. & M.* 107, Chief Justice SHARKEY said : "Possession by the vendee, is evidence to creditors and purchasers of the conveyance; or, at least, is so strong a circumstance that it is now uniformly regarded as sufficient evidence of notice. This results necessarily from the nature of the act, it being a substitute for livery of seizin." He cites 10 *Mass. R.* 60; 6 *Wend.* 213; 11 *Wend.* 242; 3 *Paige* 421; 10 *Vermont* 452.

To the same effect are *Wilty vs. Hightower*, 6 *Smed. & Marsh.* 345; *Walker vs. Gilbert et al.*, 7 *ib.* 456; *Walker vs. Gilbert et al.*, 1 *Freeman's Chan. Rep.* 85.

In *Jenkins vs. Bodley*, 1 *Smed. & Marsh. Chan. Rep.* 338, the bill charges open and notorious possession. The defendant admits that such was true, but denies that he knew it until after he became the purchaser. The chancellor said : "That denial of *knowledge* cannot impair the effect of the fact of possession. It seems now to be very generally admitted, that where a person is

in open and actual possession of land, even though he claim by an equitable title, that possession is sufficient to put a subsequent purchaser upon inquiry, as to the actual rights, and the nature of the claim of such occupant ; and is constructive notice of the nature and extent of those rights."

In *Chesterman vs. Gardner*, 5 *John. Chan. Rep.* 30, Chancellor KENT states the doctrine in general terms, that possession of a tenant is notice to a purchaser of the actual interest of the tenant, and of the extent of that interest. But the facts of the case show that the purchaser (assignee of a mortgage) knew of the possession of the tenant.

In *Governeur vs. Lynch*, 2 *Paige* 300, Chancellor WALWORTH said : "If a vendee is in possession of land, under a contract to purchase, a subsequent purchaser or mortgagee has constructive notice of his equitable rights, and takes the land subject to his prior equity." It does not appear from the report of this case whether the subsequent incumbrancer had knowledge of the possession or not.

In *Grimstone vs. Carter*, 3 *Paige* 423, the vice chancellor recognizes the doctrine that possession is constructive notice, or sufficient to put the purchaser on inquiry ; but then it appears that the purchaser had knowledge of the possession.

In *Tuttle vs. Jackson*, 6 *Wend.* 213, the same doctrine is recognized, and nothing is said about knowledge of the possession.

In *Parks vs. Jackson*, 11 *Wend.* 463, Senator SEWARD said : "Was not their possession notorious : and is it not a well settled principle of law, that possession of land is *notice to all the world*, requiring those who would concern themselves in it, or litigate for it, *to take notice not only of the possession itself*, but of the right, title, and interest, whatever it may be, of the possessor?" See, also, 5 *Barb. Chan. Rep.* 316.

In *Norcross exrx. vs. Widgery*, 2 *Mass. Rep.* 506; *Reading of Judge Trowbridge*, 3 *Mass. Rep.* 575; *Marshall vs. Fish*, 6 *Mass.* 30; *Prescott vs. Heard*, 10 *Mass. Rep.* 59; *McMechan vs. Griffing*, 3 *Pick. Rep.* 155; *Farnsworth vs. Childs*, 4 *Mass.* 639;

374                CASES IN THE SUPREME COURT

Hamilton et al. vs. Fowlkes et al.                [July

*Dudley vs. Sumner*, 5 *Mass. R.* 457, *and* 1 *Pick. Rep.* 174, it is held, that where one becomes the purchaser of, land, enters upon it, and follows the entry by a visible improvement of the land, and taking of the profits thereof, it is such an evidence of an alteration of the property, as will amount to implied notice thereof. In some of these cases, it appears from the facts reported, that the subsequent purchaser had knowledge of the possession, but none of the cases are made to turn upon the fact of such knowledge.

In *Miles vs. Langley*, 1 *Russ. & Mylne* 39, the MASTER OF THE ROLLS seems to have made the effect of possession turn upon the knowledge of the purchaser; but we have been able to find no other case where it was held that *open, actual*, and *visible* possession of land, was insufficient to put subsequent purchasers upon inquiry, as to the title of the possessor, unless an actual knowledge of such possession was brought home to them : and after a careful examination of the authorities cited by the counsel for both parties, this branch of the subject may be concluded by a quotation from the opinion of Judge GOLDTHWAIT, in *Scroggins vs. McDougald et al.*, 8 *Alabama Rep.* 384. He says : "The admissions of the counsel for McDougald, as well as the evidence, &c., establish that the complainant and Bagly, under whom she claims, had the actual possession of the lot at the time when McLean assigned the certificate of the commissioners to McDougald, by means of which he subsequently obtained the title. The only question, therefore, in this aspect of the case, is whether the possession so held was a sufficient matter to put the defendant, McDougald, on inquiry as to the title of the occupants, and thus affect him with notice, *although in point of fact, he had no information that the possession was thus held.* It is laid down very generally in the books, that whatever is sufficient to put the purchaser upon inquiry, is good constructive notice. *Atk. on Mark. Titles*, 573; 2 *Sug. on Vend.* 290. It is difficult to conceive what circumstance can be more strong to induce inquiry, than the fact that the vendor is out of possession and another is in.

Accordingly it has been held, that information to a purchaser, that a tenant was in possession, is also notice of his interest.  13 *Vesey* 120.  And if any part of the estate purchased is in the occupation of a tenant, it is considered full notice of the nature and extent of his interest.  *Atk. on Mark. Titles*, 574.  In the American courts, the rule is very generally recognized, that if a vendee is in possession of lands, a subsequent purchaser or mortgagee has constructive notice of his equitable right.  1 *Monroe* 201; 4 *Litt.* 317; 5 *John. Chan.* 29; 2 *Paige* 300; 3 *ib.* 421.  As the complainant in this case was in the occupancy of the land at the time when McDougald acquired it by purchase or transfer from McLean, *it is immaterial whether knowledge of the occupancy can be traced to him, because the law casts on him the duty of ascertaining how that fact is.*  If a different rule is admitted, *a purchaser residing at a distance from the land, would rarely be charged with notice on this account.*

Fowlkes admits that he had heard that there was some agreement between Hamilton and Carrington, about their lands in Lost Prairie, but says he could not ascertain the character of it.  He does not state of whom he made inquiry.  Had he enquired of Carrington, Rust, or Hamilton, perhaps he might have obtained correct information as to the nature of the agreement.

Vague and indeterminate rumor, or suspicion, is quite too loose and inconvenient in practice to be admitted to be sufficient; (1 *Story's Equity, sec.* 400,) but the fact that Fowlkes had heard that some agreement existed between Carrington and Hamilton, the character of which he perhaps might have ascertained by application to the proper source, taken in connexion with the fact that Hamilton was in the open and visible occupancy and cultivation of the land, must be deemed legally sufficient to put him upon inquiry, and charge him with constructive notice of Hamilton's equity.  Had he, in the exercise of ordinary prudence—such as the law expects of every one about to purchase a valuable estate—gone upon the premises, inasmuch as the cultivation of Carrington extended to the dividing fence on the north, and

the cultivation of Hamilton to the same fence on the south, it is but natural that he would have enquired whether the fence was the boundary of the land which he was about to purchase. It is not unreasonable to expect a purchaser to enquire whether his vendor or another is in possession of land which he is about to purchase, and to pay some attention to the extent and lines of the estate.

Moreover, the mortgage to Hamilton purports to convey but his right, title, and interest in the land, and although the lands are described by the legal subdivisions of the surveys, the number of acres conveyed is left in blank. The deed from Rust and wife to Fowlkes, is but a quit-claim. There was nothing, therefore, in either conveyance calculated to induce Fowlkes to dispense with inquiry as to the extent of Carrington's title.

Upon all the facts of the case, we think it is but just and equitable, that the decree of the court below should be reversed, and the cause remanded, with instructions to the court to ascertain the quantity of land to be conveyed by one to the other, state an account between the parties, and decree a specific performance of the contract, in accordance with the prayer of the bill.