Millsaps *v.* Strauss.

4-7547                                    185 S. W. 2d 933

Opinion delivered March 5, 1945.

*Claude F. Cooper* and *T. J. Crowder,* for appellant.

*A. B. Shafer* and *James C. Hale,* for appellee.

Griffin Smith, Chief Justice.    January 12, 1942, Ora Bobo Millsaps sued John A. McKnight, alleging that she held his $1,000 promissory note dated July 10, 1941, payable on demand with interest at five per cent. from date.   In February, 1942, G. D. Strauss asked Crittenden Chancery Court for an order requiring specific performance of a contract executed July 10, 1941, by L. A. and Ora Bobo Millsaps, husband and wife, under the terms of which Strauss was to purchase Millsaps' 160-acre farm near Crawfordsville.   The escrow depositary was named with Millsaps as a defendant.

The Chancery suit alleged that Millsaps was in possession of the land, refusing to accept payment of certain balances; that the depositary declined to deliver the deed or accept the money because contractual terms were that payment should be to Millsaps instead of to the deposi-

tary, and that Strauss had met all conditions precedent to his right of entry. From a decree directing delivery of the deed, L. A. Millsaps has appealed.

In his answer Millsaps admitted execution of deed and contract and refusal to accept the consideration. Instead, he tendered repayment of funds advanced to him and prayed cancellation of the instruments, alleging they were procured through coercion and by fraud.

McKnight, in an amendment to his supplemental answer to Ora Bobo Millsaps' suit, alleged that the $1,000 note had been endorsed in blank; that L. A. Millsaps claimed ownership and was asserting that the note was surreptitiously taken from his possession. In the alternative it was asked that proceedings in Circuit Court be stayed or that the complaint be transferred to equity. A responsive order was apparently made, for L. A. Millsaps filed an intervention and answer in Chancery.

L. A. and Ora Millsaps each had a son by marriages prior to their union with each other. Ora's son was C. D. Hampton, who was shot and killed June 28, 1941, at the home of his mother and stepfather. L. A. Millsaps was accused of having murdered C. D. After first denying, then admitting the shooting, he entered a plea of guilty to the charge of second degree murder and was sentenced to serve twenty-one years in prison, ". . . but that sentence and punishment [will] be held up on the condition that the defendant leave the State of Arkansas and not return to said State of Arkansas nor to Crittenden County."

The accused moved to Memphis, where he has since resided. He was seventy years of age when depositions in the case at bar were taken.

McKnight had frequently befriended Millsaps. He ginned the Negro's cotton, produced on 110 acres of cultivated land, and on occasions had made money advances and personal loans. McKnight testified that he had known Strauss for several years; that he had represented him in business deals, and dealt for him in the purchase of Millsaps' farm. McKnight's first activity occurred when

Millsaps (in jail at Marion) sent for him. Millsaps said he would have to sell the land, remarking, ''They are going to turn my wife loose and let her sue me and take the property. He didn't say anything about getting out of trouble—only wanted to put his property where 'they' couldn't get it.''

McKnight testified that he told Millsaps he would see what could be done. He talked with Walter Burnett, an attorney representing Millsaps. The witness was certain Millsaps was told not to be in too much of a hurry. McKnight promised to investigate, and said that the matter would be discussed later. He then consulted with Burnett, and ''. . . we decided what he was talking about was probable—could happen—so then the question came up about letting him sell it.'' An offer was made for Strauss, the price to be $50 per acre—$8,000. Millsaps' wife agreed to accept $1,000 for her dower and homestead rights. This payment was represented by the note Ora sued on.

McKnight testified very emphatically that while Ora was in jail she first told him she accidentally shot her son. There was recantation later, coupled with an assertion that her husband did the killing. Millsaps' own son was placed in jail in connection with the homicide. The story was relayed to Millsaps that this son, who had first concurred in the explanation that Ora did the killing, had changed his story and intended to testify against his father.

In these circumstances, influenced, as he says, by threats of civil actions and electrocution, and having been persuaded that his only chance to salvage life or property was acceptance of the so-called Strauss offer, Millsaps signed the contract and later gave McKnight a written order to make certain payments.

After the sale was made, and before ''trial'' on the criminal charge, Millsaps told McKnight and others he was dissatisfied, insisting that he was innocent, and protesting that Ora accidentally shot her son. There is testimony that Millsaps was advised that he would be ''safe''

insofar as the land was concerned if Ora could be trusted. This he was not willing to do.

Millsaps testified that after being arrested on Tuesday following his stepson's death the preceding Saturday, he employed Burnett, but was kept in the jail death cell, but, ". . . after I hired C. D. Nance I had the privilege of getting out. Just as soon as I employed Nance he 'hollered' up and told the man with the keys to turn me out."

The day he signed the contract Millsaps was taken for a conference at the courthouse, where McKnight and a number of lawyers were in waiting. There McKnight said to him: "It looks like you are going to the pen, and if you don't sell the sheriff will sue you for the expense of this court." Burnett assured Millsaps that McKnight was the best friend he had, adding, "You had better listen to him." The accused begged for the privilege of communicating with men he felt sure would buy the farm at a price substantially greater than that offered, *prima facie*, by Strauss, but was told he wouldn't have time for that. He informed those attending the meeting that Cabe Robinson had formerly expressed a desire to purchase the place any time the owner was willing to sell; whereupon, according to Millsaps, "For a few minutes I looked at Mr. Burnett, and they all sighed. . . . Then Mr. McKnight said he was buying it [for himself] but that [the deed would have to be made to Strauss] to keep 'them' from suing [the grantee] and [subjecting it to the payment of any judgment that might be procured against Millsaps]." McKnight is alleged to have replied to a counter suggestion that the price be $9,000, "No, this is a good price, and if you can't get *out* you can't get any more for it."

Millsaps earnestly insisted, when giving his deposition, that Robinson had offered $75 per acre for the place as a whole; that others were willing to pay considerably more than McKnight offered; that the land was relatively new in point of cultivation, and that it compared favorably with places in the community that brought $100 an acre in 1941. Robinson testified that $85 per acre was

reasonable, and confirmed Millsaps' statement that he (Robinson) had offered $75 per acre "before the trouble came up." Other testimony strongly supported the contention that $8,000 was an extraordinarily low offer even before land attained its present status on the price peak. Undisputed testimony was that a bale and three-quarters of cotton per acre had been produced. A bale to the acre might be expected any year. The soil is admirably adapted to the growth of corn and other essential crops.

Lawyer Nance, said Millsaps, offered to procure a suspended sentence on the murder charge, the price being $2,500. The witness then added: "Mr. McKnight must have thought that it was too much, and cut it down to $2,200." Additional testimony on this point is shown in the footnote, taken from appellant's abstract.[1]

Substantiating Millsaps' contention that money influenced procurement of the suspended sentence is Burnett's testimony that, anticipating suit by the administrator of C. D. Hampton's estate (which was later filed) he was employed by Millsaps to defend the civil action, but when Nance became interested he (Burnett) agreed with Nance that fees should be "split fifty-fifty." The witness then added: "Nance went on, took 'it' out of my hands, and kept all the money. That is all there was to it —that is, if he got any: I don't know that he got any of that."

---

[1] "After he cut it down to $2,200 they came back into Lawyer Nance's office and Mr. McKnight told me they had it down to $2,200. [Then] Mr. McKnight walked over to me and said, 'I think they can get it down to $2,000.' Lawyer Nance told me it was better to pay the $2,000 than to be sent to the pen for twenty-one years and labor under a hard taskmaster where I wouldn't hold up a month at my age. He told me not to let Lawyers Burnett and Cooper know anything about it. He and Mr. McKnight both told me that if I told them, they would tear it all up."

Additional testimony by Millsaps in explanation of the payment of $2,000 is copied in the margin.[2]

McKnight heard conversations between Millsaps and his attorneys while Millsaps awaited sentence in Circuit Court. His recollection was that the presiding judge said, "Do you understand that this was paid as an attorney's fee?" McKnight had first given Nance $500, but did not manually make the $2,000 payment. He knew there had been an agreement to turn the larger sum over to Nance, so the arrangement was that McKnight procure the currency. This he did and took it to Millsaps' jail cell, where it was handed to Millsaps, who in turn, and in McKnight's presence, paid it to Nance.

. . . . .

In an opinion written for the Circuit Court of Appeals by Judge Sanborn (Eighth Circuit) conviction of Cecil B. Nance, C. C. Culp, and Jim Miller was affirmed. Trial was before Hon. Thomas C. Trimble, presiding over the District Court of the United States for the Eastern District of Arkansas, sitting at Jonesboro. The charge was conspiracy in violation of Criminal Code § 37, 18 U. S. C. A. § 88, to commit an offense against the United States by depriving, under color of state law, certain

[2] "When we went into court, the Judge and Prosecuting Attorney took me into a private room and asked me had anyone told me I had to pay to get a suspended sentence. I told them, 'yes.' They asked me who it was, and I told them Lawyer Nance. They asked how much and I told them $2,000. They told me I didn't have to pay any money to get a suspended sentence in that court. They asked me if I was willing to plead guilty of killing the boy. I told them if I did [it] Jesus Christ did. The Prosecuting Attorney walked out, saying they would send me to the pen for life then. When I came back in there they all seemed like they were mad or something or other. Lawyer Nance came to me and told me he had succeeded in getting me the suspended sentence. I told Lawyer Nance if he would get that then, and let me [out] I would plead guilty. He talked to them awhile and then took me back to the back of the courtroom and took out a piece of paper in his hand, requiring all that $2,000 be paid for lawyer's fee. He went on back when they got ready, called me up, and I pleaded guilty and the Judge gave me a 21-year sentence. I asked the Judge's permission to attend to a little business, and he told me I would have to 'tend to it from the jail. I went to Mr. McKnight and told him I had to go, and didn't have any money and asked him if he would pay me. He said, 'Not until you get an abstract for the place.' And he said, 'I will be down here early in the morning.' I went on back to jail. I stayed in until about 10 or 11 o'clock and my wife and son came around and I told my son to go tell Mr. Burnett to turn me out, and I came on over to Memphis."

named inhabitants of Arkansas and other states of the rights, privileges, and immunities secured to them by the Constitution and laws of the United States in violation of Criminal Code § 20, 18 U. S. C. A. § 52.

Specifically it was charged that a conspiracy existed, followed by overt acts, whereby certain persons would be arrested without cause, imprisoned in jail at Marion or West Memphis, falsely charged with violations of the laws of Arkansas or the ordinances of West Memphis or Marion, and would then be unlawfully held in confinement for long periods without being permitted to communicate with anyone outside of jail. They would frequently be assaulted for the purpose of extortion. After the treatment so administered had become sufficiently impressive, those arrested were informed that discharge could be procured by communicating with Nance. When conferred with by the "victims" Nance would tell them they could be released only upon payment of large sums of money, to be given either to him, Miller, or Culp. Thereupon those so held would be allowed to communicate with relatives or friends to obtain the necessary funds. When the ransom money became available the defendants were sometimes taken before a local magistrate, who upon instructions from the peace officer would make docket entries of fines or pretended fines, based upon false charges of crimes and misdemeanors.

In the Sanborn opinion there is this reference: "The Millsaps case also involved the collection by Nance, from the father, of a fee of $1,100 or more after Nance had agreed to defend him against all charges, civil and criminal, for $750. The Government's evidence relating to the Millsaps case was not irrelevant, and the conduct of . . . Nance, as disclosed by the evidence relative to that case, was similar to [his] dealings with other 'victims.' "

McKnight appears to have been a witness in the Federal Court case. While his deposition was being taken in the instant case he was asked if he had (at the Culp-Nance-Miller District Court trial) testified that "under the setup [existing in Crittenden County at the time Mill-

saps was accused] he thought it was best for the Negro to sell the land." He gave an affirmative answer.

The question was then asked: "And you knew about the setup—the 'setup' at the time you bought the land?" Answer: "Yes, sir." Question: "And that setup was that [certain officials] were trying to take this land away from Millsaps?" Answer: "That is correct, yes, sir."

Burnett was asked whether the criminal charge against Millsaps had anything to do with his sale of the property, and responded that it did. His opinion, in substance, was that but for official pressure there would have been no sale of the property.

The decree, in awarding specific performance, found that Millsaps was entitled to receive a balance of $1,848.32.[3] There is reference to settlement of rents for 1941, but, in the view taken by the Chancellor, Millsaps seemingly did not retain an interest. The Court found in respect of Ora's claim to half of the profits for 1941 that evidence was insufficient, and directed appointment of a master.

We think the evidence and reasonable inferences to be drawn from circumstances show that the payment of $2,000 was something more than an attorney's fee, and that a plan (craftily withheld from the Court's knowledge) to purchase freedom for the accused formed the basis for sale of the farm for a wholly inadequate price. It is also our view that McKnight occupied the dual role of friend of the Negro for the purpose of procuring his release, and interested stranger for the purpose of acquiring the land. The record is as significant by that which is partially concealed, but unintentionally revealed, as it is by the affirmative information disclosed through testimony, and to be inferred from the pleadings.

---

[3] Itemization was: Paid to Millsaps as per his receipt, $2,900; cost of perfecting title and abstracts, back taxes, etc., $251.68; amount to be paid by plaintiff to be interpleaded for by and between L. A. Millsaps and Ora Bobo Millsaps, $1,000, amount to be charged to Millsaps for 1942 and 1943 rents, [Millsaps having continued in possession of the farm] $2,000.—Total, $6,151.68.

In Millsaps' reply brief it is asserted that "Nobody connected with this litigation except McKnight knows G. D. Strauss. He gave no testimony, he did not attend the taking of any depositions, he did not come into Court, he did not manifest any interest whatsoever, and he is wholly unknown to the Chancellor, or anyone else, so far as we know."

Inference is that "Strauss" is a fiction. But it does not make any difference whether the named grantee had a physical existence or was merely a name. All of the evidence tends to show that McKnight was making a personal purchase. As early as July, 1941, he gave Ora his personal note for her claimed interest. While denying that $8,000 was inadequate in 1941, he conceded the farm's worth (when depositions were taken) was substantially greater than figures mentioned in the contract.

We do not impute to McKnight any disloyal purpose in negotiating for the release of Millsaps. He doubtless believed the Negro's assertion, and Ora's initial confession, that the mother accidentally shot her son. But the activities of Nance as lawyer, McKnight's understanding of the so-called "system," and the ends to be served through procurement of $2,000 in currency and payment to one who obviously claimed for himself ability to "fix" the criminal charge—these things present a situation where equity should not decree specific performance.

Although McKnight appears to have been hostile to the "system" and seems to have been a government witness when the Civil Liberties trial was had, his connection with Nance, and his knowledge of the subversive pattern, should have sufficiently warned him that Millsaps was not unfettered. To the extent that the prisoner profited by money he directed McKnight to expend in his behalf, the payer should not suffer loss. This is another way of saying that Millsaps would have no standing in a suit to recover any payments made for his benefit. Nor can Ora collect the McKnight note.

Because it has been thought essential to the clarity of this opinion to copy the Circuit Court judgment, there

is no inference that we are passing upon legality of that part of the sentence requiring the defendant to leave the State. See art. 2, § 21, Constitution of 1874. In *Ex Parte Hawkins*, 61 Ark. 321, 33 S. W. 106, 30 L. R. A. 726, 54 Am. St. Rep. 209, it was held that a statute authorizing the Governor to grant pardons on condition that the convicted person should leave the State and not return did not conflict with the Constitutional interdiction against enforced exile. Reason assigned by Mr. Justice Riddick was that art. 6, § 18, of the Constitution authorizes the Chief Executive to grant pardons under such rules and regulations as shall be prescribed by law, and the act of the Governor then questioned had been authorized by the Legislature. See *Kavalin* v. *White, Warden*, 44 Fed. 2d 49, and cases there cited. No statute attempting to confer this power upon judges has been called to our attention, and there is no such provision in the Constitution.

It will be noted that the judgment sentenced Millsaps to serve twenty-one years in the penitentiary. The suspension order followed. While validity of the procedure is not directly involved here, it may be informative to call attention to Act 76, p. 40, approved Feb. 9, 1923. Pope's Digest, § 4053.[4]

The decree directing specific performance is reversed, with directions that the contract of July 10, 1941, and the $1,000 note of the same date, be cancelled. The cause is remanded for any equitable proceedings that may be proper to settle rental claims for 1941 (and other matters of controversy not covered by the decree and passed upon in this appeal), to be adjudicated in a manner not inconsistent with this opinion.

Mr. Justice McFADDIN dissents.

---

[4] See *Davis* v. *State*, 169 Ark. 932, 277 S. W. 5; *Ketchum* v. *Vansickle*, 171 Ark. 784, 286 S. W. 948; *Denham* v. *State*, 180 Ark. 382, 21 S. W. 2d 608; *Hartley* v. *State*, 184 Ark. 237, 42 S. W. 2d 7; *Freeman* v. *Benton*, 191 Ark. 1131, 89 S. W. 2d 738; *Spears* v. *State*, 194 Ark. 836, 109 S. W. 2d 926. [Analogous: *Emerson* v. *Broyles*, 170 Ark. 621, 280 S. W. 1005, 44 A. L. R. 1193; *Davis* v. *State*, 184 Ark. 1062, 45 S. W. 2d 35.] [In *Lamkin* v. *State*, 138 Tex. Cr. R. 311, 136 S. W. 2d 225, the Court of Criminal Appeals for Texas held that no appeal would lie from a suspended sentence, since it is not a final judgment from which an appeal may be taken.]

[But see Act No. 298, approved March 20, 1945.]

McFADDIN, J., dissenting. L. A. Millsaps, a negro man, killed his stepson, C. D. Hampton. Millsaps then threatened to kill his wife, Ora Bobo Millsaps, unless she stated that *she* had accidentally killed her son. That is the character of person to whose word the majority attaches so much importance!

When Millsaps and his wife were separately confined she told the truth about the killing. Then Millsaps became frightened. He needed money to defend the murder case, and he also wanted to put his property beyond the reach of the estate of C. D. Hampton: so Millsaps decided to sell his property. He did; and now, from a safe haven in another state, he says the sale was forced on him and he was defrauded. His wife testified as to who forced him to sell the property when she said, "He was forcing himself."

On the most vital and essential parts of his case, the testimony of L. A. Millsaps stands alone and uncorroborated; and is contradicted by four witnesses. One of these was an attorney (Mr. Burnett) who, along with other attorneys, represented Millsaps in the murder case, but who is not of counsel in this present litigation. That attorney testified that he advised Millsaps about the possibility of a damage suit; and the attorney says that he might have been the first to have suggested the land sale. Another witness—also entirely disinterested in this present suit—testified that he heard all the conversation between McKnight and Millsaps, and that McKnight made none of the statements imputed to him by Millsaps.

No useful purpose would be served by reviewing all of the evidence. It is sufficient to say that I am unwilling to hold that the chancery court decided against the preponderance of the evidence in this case when the chancery court accepted the testimony of four witnesses against the unsupported and—to me—wholly unreasonable story of L. A. Millsaps, who admits that at one time he pleaded guilty, but now says he is innocent.

Finally, there is in the transcript in this case none of the evidence heard at the trial and conviction of Nance

*et al.,* in the federal court. The federal case was mentioned as a gratuity in the briefs; and the majority has seized on this wholly extraneous gratuity, and the opinion delivered by the federal court (on facts that are not in the record before us); and from these matters has painted a picture of conditions which are not shown in the record in this case. I therefore respectfully dissent.