**Lelia M. McCARGO, Plaintiff,**

v.

**Alma V. STEELE, Individually, and as Executrix of the Estate of Charles F. Steele, Deceased, Defendant.**

Civ. No. 630.

United States District Court
W. D. Arkansas,
Texarkana Division.

March 7, 1958.

Denman & Denman, Prescott, Ark., for plaintiff.

Keith, Clegg & Eckert, Oliver M. Clegg, and William A. Eckert, Magnolia, Ark., for defendant.

LEMLEY, Chief Judge.

This cause having been tried to the Court and briefed by the parties, and the Court being well and fully advised, doth file this memorandum opinion incorporating its findings of fact and conclusions of law, as authorized by Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A.

The plaintiff, Mrs. Lelia M. McCargo, a citizen of Prescott, Nevada County, Arkansas, has brought this action against the defendant, Miss Alma V. Steele, a citizen of Ohio, for the purpose of compelling the latter, individually and in her capacity as executrix of the estate of Charles F. Steele, deceased, who died testate in Nevada County on January 24, 1956, to specifically perform a certain written contract entered into between the plaintiff and the deceased on March 15, 1954, under which the plaintiff claims to be entitled to an undivided one-fourth interest in and to such real and personal property as the deceased owned at the time of his death located in Nevada County, which property includes certain mineral leases and royalties. The value of the interest which plaintiff seeks to recover is much in excess of the jurisdictional amount of $3,000.

The litigation was initially commenced by the plaintiff's filing a claim, based on the contract, against the estate of the deceased in the Probate Court of Nevada County. After an unsuccessful removal of the claim to this court, which resulted in a remand, the Probate Court transferred the matter to the Chancery

Court, and thereafter it was again removed here.[1] After this second removal the plaintiff filed an "Amendment to Claim," and we shall refer to the claim and the amendment thereto as the "complaint."

It is the theory of the plaintiff that her contract with the deceased was and is valid, that she fully performed thereunder, that the deceased died without having executed certain contemplated assignments in her favor called for by the contract, that the defendant has wrongfully refused to recognize or to carry out the obligations of the contract, and that she is entitled to specific performance.

The defendant, on the other hand, takes the position that the contract was invalid at its inception for a number of reasons, hereinafter set forth, that it is unfair, harsh and oppressive and should not be specifically enforced, that it was mutually rescinded or abandoned by the parties, or that the plaintiff abandoned her rights under it, and that the plaintiff has been guilty of such laches as precludes her from obtaining the relief which she seeks.

We have considered these conflicting contentions in the light of the evidence produced at the trial (some of which was in dispute), and of what we deem to be the governing principles of Arkansas law, and we have come to the conclusion that the defendant's position cannot be sustained, and that the plaintiff is entitled to prevail.

As stated, the evidence was in certain respects disputed, but from it we find the following basic facts:

For many years prior to his death the deceased had been engaged in Nevada County, Arkansas in dealings in oil and gas leases and royalties under lands supposed to contain deposits of those minerals, which business necessitated considerable correspondence, the preparation of legal instruments of various kinds, including oil and gas leases, assignments, mineral deeds and overriding royalty agreements; it also entailed the payments of delay rentals on non-producing leases, the assessment and payment of taxes on his mineral interests, and numerous checkings of the land records of Nevada County. During his activities he was represented by the law firm of Denman & Denman of Prescott, whose secretary the plaintiff has been for about twenty years.

The evidence disclosed that the plaintiff did a considerable amount of Mr. Steele's stenographic work prior to his death, that for a time at least she prepared some of the checks signed by him in payment of delay rentals, and that she frequently would go to the Circuit Clerk's office to check land records for him. When Mr. Steele had work for the plaintiff to do, it was his custom to come to the office of Denman & Denman and there to dictate to her whatever letters or instruments he had for her to write or draw; and there was also evidence, which we credit, that on occasions on week-ends she would go to his home and there perform work. The work which the plaintiff performed for the deceased had nothing to do with her employment by Messrs. Denman & Denman, and there is no evidence that they supervised it or had anything to do with it.

During the last several years of his life Mr. Steele was in poor health, made frequent visits to his doctors, and required almost constant physical attention. There was no evidence, however, that his mental faculties were in any way impaired or that he was not fully competent to transact business and to protect his own interests in business dealings. He was never married, and all of

1. In remanding the case when it was first removed we took the position that the nature of the proceedings was such that the Probate Court had no jurisdiction with respect thereto, and that we acquired none on removal. As indicated, after our remand the Probate Court, on the authority of Merrell v. Smith, 226 Ark. 1016, 295 S.W.2d 624, transferred the case to equity, where it became an ordinary suit between parties of diverse citizenship, and since the jurisdictional amount was present, the second removal was proper and has not been questioned.

his heirs are collateral kindred, the defendant being his sister.

At the time of his death he was the owner of substantial holdings in the newly developed Falcon oil field in Nevada County, and according to the defendant's evidence his holdings at the time of the trial were producing a gross income of about $3,100 or $3,200 per month, slightly less than they were producing at the time of his death. It is a well known fact that the Falcon field is a recent development, and there is little evidence bearing upon the deceased's financial situation prior to the discovery of oil in that field; that it was not affluent is indicated by the fact that he had made numerous small loans from the First National Bank of Magnolia, Arkansas, and on at least one occasion pledged his diamond ring as security.[2] At the time of his death he was indebted to the bank in a sum slightly in excess of $5,000.

The instrument in suit, which is a typewritten document signed by both parties but not witnessed or acknowledged,[3] is entitled "Contract & Agreement," and commenced with a recitation of Mr. Steele's poor health and short life expectancy, and of his need to have someone help him to look after his affairs. It then provides in substance that in consideration of the mutual promises of the parties, and of services rendered and to be rendered by the plaintiff, the deceased would "assign" to her an undivided one-fourth interest in and to all property, both real and personal, including mineral rights and interests, of which he might die seized and possessed in Nevada County, and that until proper assignments should be executed, he would defray her expenses for gasoline and oil incurred by her in looking after his interests. The services that the plaintiff was to perform were those of a "stenographer and assistant business manager," and she affirmatively undertook to perform those services for the remainder of Mr. Steele's life. It was further agreed that after his death she was to continue to advise and assist his "heirs, successors and assigns" in looking after his estate at "a reasonable salary to be agreed upon," and, further, that should the estate stand in need of legal services, the plaintiff was to employ a firm of lawyers of her own choice, namely, Messrs. Denman & Denman, and that should the services of that firm not be available, then she should select some other firm of her choice. The contract obviously contemplated that it was to be implemented by the execution and delivery to the plaintiff of one or more inter vivos assignments covering the interest to be conveyed to her, but it stipulated that if Mr. Steele should die before the execution of such assignments, then "this contract and agreement shall serve as an assignment to an undivided $\frac{1}{4}$th interest in and to all properties of which I may die seized and possessed in Nevada County, Arkansas." It was further agreed that if the plaintiff should die before Mr. Steele and before the execution of the contemplated assignment, then Mr. Steele would pay to her daughter the sum of $25,000 in full settlement of any claim that plaintiff might have had against him. The agreement recited that it was to continue from month to month and year to year "until terminated by death," and that it should be binding not only upon the immediate parties but also upon their heirs and assigns.

We find that after the execution of this contract the plaintiff performed under it

**2.** While, as stated, there is little evidence as to the deceased's financial condition prior to the discovery of oil in the Falcon field, it is a matter of common knowledge that values of oil and gas holdings, and the fortunes of oil and gas operators are subject to wide and sudden fluctuations both ways.

**3.** In her answer the defendant formally denied that the deceased had executed the contract or delivered it to the plaintiff; in the course of the trial, however, after substantial evidence had been introduced to show that he had in fact signed and delivered the agreement, counsel for the defendant conceded that those matters were no longer issues in the case.

up until the death of Mr. Steele, almost two years later, doing under his supervision and at his direction such work as she was called upon to do from time to time. Moreover, the reference in the contract to services performed by her in the past indicates that she had done similar work prior to the making of the agreement for which work Mr. Steele did not consider that she had been adequately compensated. This indication is strengthened by his unconditional agreement to pay to her daughter the sum of $25,000 should she predecease him, no minimum time being prescribed for her to perform services in the future.

On April 26, 1954, about six weeks after the contract had been signed, Mr. Steele executed his last will and testament, which was witnessed by the plaintiff, and by Mr. W. F. Denman, Jr. In that instrument the testator directed the payment of his just debts and funeral expenses, and then devised and bequeathed his entire residuary estate to his sister, the defendant here, who was designated as sole executrix to serve without bond.

Shortly after the will was made, Mr. Steele appeared in the company of his sister at the First National Bank of Magnolia and arranged with Mr. Winston Wilson, vice president of that institution, to assist her in the management of the estate after his death, and sometime in December, 1955, shortly prior to his death, when he was in the bank in connection with making a loan, he advised Mr. W. C. Blewster, the president of the bank, in Mr. Wilson's presence, that the latter would be the man who would be looking after his affairs after he was gone. There is no evidence, however, that the plaintiff knew anything of these arrangements during Mr. Steele's lifetime.

In September, 1954 Mr. Steele employed a Mr. John Savage in the capacity of a bookkeeper, his duties being primarily to reconcile the former's bank statements and cancelled checks with his check stubs, and to record his receipts and disbursements. Mr. Savage was employed on a full time basis for about a year, and worked part-time after that. Mr. Savage's employment, however, did not conflict with or overlap that of the plaintiff since she had never been employed as a bookkeeper, and, as has been said, she continued to work for Mr. Steele up until the time of his death, performing such tasks as she was called upon from time to time to perform.

Between the date of the contract and his death Mr. Steele drew twelve checks in favor of the plaintiff, which she cashed, in the total sum of $395, some of which bore notations to the effect that they had been given in payment of services rendered or for "extra work." Eight of these checks were written in 1954, three in 1955, and the final one on January 12, 1956, less than two weeks prior to his death. The final check bore no notation of any kind.

While the defendant points to the execution of the will, witnessed by the plaintiff, to the employment of Mr. Savage, and to the checks that have been mentioned as evidencing an abandonment by the plaintiff of her rights under the contract or of a mutual rescission of that agreement, the plaintiff's evidence, which we again credit, showed that less than a month before his death Mr. Steele on two separate occasions by his acts and declarations recognized the contract as being in force, and, in effect, republished it, once in the presence of Mrs. Esther Husky, and again in the presence of Mr. J. D. Franks, both of Prescott.

Mrs. Husky testified in substance that between Christmas, 1955, and New Year's day, 1956, Mrs. McCargo requested her to come down to her nearby house one evening; that she acceded to this request and upon her arrival found Mr. Steele present. Mr. Steele desired to borrow $5,000 from her, the purpose of the loan being "something about income tax." Mrs. Husky inquired of Mr. Steele concerning security and he turned to Mrs. McCargo and instructed her to get her contract with him and show it to Mrs. Husky. This was done and Mrs. Husky read the contract. She then told Mr.

Steele that her money was otherwise invested and the subject was dropped. While it does not clearly appear why Mr. Steele had Mrs. McCargo produce her contract when Mrs. Husky made inquiry about security, it is at least inferable that had Mrs. Husky manifested any interest in making the loan, Mr. Steele might have made her a proposal similar in nature to his agreement with the plaintiff and to an agreement with a Mr. Oswalt which is in evidence in this case.

Mr. Franks testified that he and Mr. Steele had been friends for many years; that he had done a considerable amount of notarial work for Mr. Steele, and that the latter referred to him as "his notary." He further testified that on an occasion late in December, 1955 he was called to the office of Denman & Denman; that Mrs. McCargo and Mr. Steele were in the office, no one else being present; that he was shown the contract in suit, and that Mr. Steele asked him to read it and take an acknowledgment thereof, which he was unable to do because he had permitted his notarial commission to expire; that he stated that he would renew his commission and take the acknowledgment, but that Mr. Steele died before he did so.

As stated, Mr. Steele died on January 24, 1956, and he did so without having executed the assignments in favor of the plaintiff contemplated by their contract. His will was admitted to probate the following month, the proof of will being executed by the plaintiff and by Mr. W. F. Denman, Jr. Letters testamentary were issued to the defendant, who took over the assets of the estate, and who has been administering them since with the assistance of Mr. Wilson, pursuant to the arrangement above referred to.

About April 1, 1956 the plaintiff, according to Mr. Wilson, presented her contract to him, and he, in turn, advised the defendant of its existence and terms, whereupon she repudiated it in toto, and has never recognized it as a valid or binding obligation. Plaintiff's original claim was filed in the Probate Court on July 26, 1956, within the statutory period for the filing of claims against the estates of deceased persons.

■■ Before undertaking to discuss the questions presented for decision, and particularly the factual ones, it should be pointed out that the plaintiff was severely handicapped in presenting her case by our determination that the Arkansas "dead man's statute"[4] was applicable to her, and that her disqualification as a witness had not been waived by the defendant's actions in taking her discovery deposition under the Federal Rules of Civil Procedure and filing the same with the clerk of this court, no part of such deposition having been actually introduced in evidence.[5] Wright v. Wilson, 3 Cir., 154 F.2d 616, 170 A.L.R. 1237; Duling v. Markun, 7 Cir., 231 F.2d 833; Anderson v. Benson, D.C.Neb., 117 F.Supp. 765. Hence, she was unable to testify as to the negotiations and dealings between herself and the deceased leading up to the making of the contract, nor as to the actual making or delivery thereof, nor with respect to the nature and value of the services which she had performed for the deceased either before or after the contract was made; nor could she testify as to any conversations between herself and the deceased.

4. Ark.Const., 1874, Schedule, Section 2, insofar as here pertinent, reads as follows: " * * * that in actions by or against executors, administrators, or guardians, in which judgment may be rendered for or against them, neither party shall be allowed to testify against the other as to any transactions with or statements of the testator, intestate, or ward, unless called to testify thereto by the opposite party * * *."

5. We announced our determination in this regard at the commencement of the trial, and counsel for the plaintiff excepted thereto. The defendant did not call her to the stand and did not offer any part of the deposition in evidence; the plaintiff did not undertake to testify in her own behalf, nor, for that matter, did the defendant take the stand in opposition to the claim although present throughout the proceedings.

True, the dead man's statute was also applicable to the defendant, but it obviously bore upon her less than upon the plaintiff, if, in fact, it handicapped her at all.

With respect to the validity of the contract, the defendant first contends that it cannot be upheld as a conveyance in praesenti because it does not purport to convey any present interest in any property owned at the time by Mr. Steele, and because the property to be affected thereby could not be definitely ascertained until his death, and that it must fall as an attempted testamentary disposition not conforming to the Arkansas statute of wills (Ark.Stats., Section 60–104) which requires that a will, other than a holographic will, be attested by at least two witnesses. We disagree.

Assuming, at least for present purposes, that the instrument cannot stand as a conveyance in praesenti, it does not necessarily follow that it must simply fail as an attempted testamentary disposition. There is a third possible construction which we think can fairly be placed upon it, and which should be adopted. And in that connection it is to be kept in mind that when parties enter into a solemn contract, there is no presumption that they intend to effect a nullity; in fact .the presumption is the other way; and their agreement should not be nullified by one characterization of the instrument expressing the same, if such result can reasonably be avoided by another. 12 Am.Jur. "Contracts," Section 251; 17 C.J.S. Contracts § 318, pp. 735–736; Gauss Sons v. Orr & Lindsey, 46 Ark. 129; Hastings Industrial Co. v. Copeland, 114 Ark. 415, 169 S.W. 1185; see also Boehmer Coal Co. v. Burton Coal Co., 8 Cir., 2 F.2d 526, 528.

We are of the opinion that when this instrument is read in its entirety, it should not be construed as a present conveyance or as an attempted will, but, rather, as an executory contract contemplating performance by both parties during the lifetime of both, although the fruits that the plaintiff would derive from her performance could not be ascertained until Mr. Steele's death, should she survive him. Under the terms of the agreement the deceased undertook, in consideration not only of past services rendered but also of future services to be performed by the plaintiff, and which she affirmatively undertook to perform, to vest in her, should she survive him, an undivided one-fourth interest in his Nevada County property which he might own at the time of his death, and he further undertook, in the event that the plaintiff should predecease him, to pay to her daughter the sum of $25,000. And, as far as the vesting in the plaintiff of an interest in his property is concerned, we think it obvious that the parties considered that such vesting should be accomplished by some effective means, which they, however erroneously, supposed to be one or more inter vivos assignments. That agreement, although inartistically drawn, amounts, in our estimation, to an agreement by the deceased to make a will devising and bequeathing to the plaintiff, should she survive him, the interest in his property for which she contracted.

Such a contract is not void as an attempted testamentary disposition, 57 Am.Jur. "Wills," Section 167; 94 C.J.S. Wills § 111(c), p. 865; nor is it offensive to public policy, 57 Am.Jur., "Wills," Section 168. In its nature and effect it is a "covenant to stand seized to the use of the promisee, with use and power of disposition except by will continuing in the promisor for life." 94 C.J.S. Wills § 111(c), p. 864. That such contracts are valid in Arkansas and will be specifically enforced when the promisee has fully performed thereunder there can be no question. Hall v. Milham, 225 Ark. 597, 284 S.W.2d 108; Alphin v. Alphin, 225 Ark. 122, 279 S.W.2d 822; Janes v. Rogers, 224 Ark. 116, 271 S.W. 2d 930; Watts v. Mahon, 223 Ark. 136, 264 S.W.2d 623; Jeffries v. Merideth, 219 Ark. 654, 243 S.W.2d 942; Brunk v. Merchants National Bank, 217 Ark. 499, 230 S.W.2d 932; Crews v. Crews, 212 Ark. 734, 207 S.W.2d 606; Jensen v.

Housley, 207 Ark. 742, 182 S.W.2d 758; Sheffield v. Baker, 201 Ark. 527, 145 S. W.2d 347; Speck v. Dodson, 178 Ark. 549, 11 S.W.2d 456; Black v. Hill, 117 Ark. 228, 174 S.W. 526; Naylor v. Shelton, 102 Ark. 30, 143 S.W. 117.

Had the contract referred to a "will" rather than to "assignments," and had Mr. Steele undertaken to "devise and bequeath" an interest in his property to the deceased rather than to "assign" such interest to her, the argument now under consideration could not have been seriously advanced; and to attach controlling importance to the particular words used would be, in this instance, to elevate form over substance, which should not be done.

In that connection, while Williams v. Williams, 128 Ark. 1, 193 S.W. 82, may not be directly in point since it involved an oral contract, nevertheless we consider the following language to be pertinent:

> " * * * There is indeed some doubt whether the agreement that the old man was to convey the land to plaintiff during his lifetime, or was to convey it by last will. We do not think it is necessary that the testimony should be free from conflict or variance on that issue, since it is fully established that the property was to be conveyed by some mode, and it is immaterial whether it was to be done by conveyance during the lifetime of the grantor, or by last will and testament. The basis of the plaintiff's claim is that there was a contract whereby he was to get the property in consideration of his services rendered to his uncle, and it is entirely unimportant as to the particular method in which the property was to be conveyed. The proof having established the contract and a performance of its terms by the plaintiff, it follows that the court of equity should grant him relief." 128 Ark. at page 4, 193 S.W. at page 83.

It will be noted that in the case just cited the Court used the term "convey by * * * last will," and here, to our mind, the language used amounts to an agreement to "assign by will."

With further regard to the form of the agreement, in 94 C.J.S. Wills § 111 (b), p. 863, it is pointed out that in the absence of a statute so requiring no particular form of agreement is necessary to bind a person in the disposition of his property at death, and that although usually such contracts include an agreement to "bequeath by will," such is not essential, it being sufficient "that there is an agreement to leave the property or that the promisee, shall have it at the death of the promisor." It is further said: " * * * the fact that the mode whereby the disposition is to be effected is not specified does not impair the validity of the agreement, nor does the fact that the promisor is given his option as to transfer by will or conveyance. An instrument in the form of a will may of itself be a contract to leave the testator's property in the manner therein provided, at any rate if delivered to the promisee. The agreement need not be executed in the form required in the execution of testamentary instruments, and it is not essential that the instrument expressing the promise contain any statement or recital of consideration. The invalidity of the agreement as a will does not prevent enforcement of its contractual provisions."

In support of her argument that this instrument is void as an attempted testamentary disposition the defendant has cited a number of cases including the Arkansas case of Hershy v. Clark, 35 Ark. 17; but it does not appear that in any of those cases the instrument involved could be fairly interpreted as an executory contract to make a will, and we feel that they are distinguishable on that basis. In Hershy v. Clark, for example, two brothers who by their joint labors had acquired certain properties agreed "that the survivor of them should have, hold and possess, all the interest

of both parties in the property, real and personal, which they then owned, to the exclusion of all other persons whatever," and each purported to convey unto the other "all his property, real and personal, which he may now have, or which he, * * * may have at the time of his death, to have and to hold the same (unto the other brother) and his heirs forever." 35 Ark. at pages 18–19. In speaking of that agreement the Court said: " * * It professes to convey nothing *in presenti*, and can not stand as a conveyance; nor can it be upheld as a mutual covenant. It is unreasonable and against public policy, that one should be allowed, by an irrevocable contract, not only to denude himself of all control of all his property, of every nature whatever, which he at the time possesses, but also of all he may afterwards acquire. Such a contract would not be enforced either in law or equity." 35 Ark. at page 22. It will be observed that the agreement involved in the Hershy case contained no executory provisions comparable to those here present, nor did it contemplate the execution of any additional instruments in the future. Moreover, in the instant case there is no question of Mr. Steele's denuding himself of control of all of his property, or of any of it for that matter; on the contrary, he retained full control of it during his lifetime.

▇▇▇ Our conclusion that the Steele-McCargo contract should be construed as a contract to make a will, and our reference to the numerous Arkansas cases upholding and enforcing such agreements, dispose not only of the defendant's contention that the instrument is invalid as being of testamentary character, but also of her argument that it is void as against public policy. Further, our construction of the agreement likewise disposes of the contention that it is void for indefiniteness of description of the property to be affected thereby. That property was simply all of the Nevada County property which Mr. Steele might own at the time of his death, in which property the plaintiff was to have an interest if she survived him; and

while the extent of his Nevada County holdings could not be definitely ascertained during his life, still it became certain upon the happening of his death. On this point it is said in 94 C.J.S. Wills § 111(c), p. 865: "A contract to leave the promisee not specific property, but such property as one has at his death, creates no trust in the property of the promisor during his life, but fastens itself on such property as he may have at the time of his death."

▇▇▇ It is further argued that the contract is fatally indefinite as to the services which Mrs. McCargo was to render the deceased. We do not think so. The contract recites that the plaintiff was to work for the deceased "as stenographer and assistant business manager," and the plaintiff agreed to "work for the party of the first part as stenographer" and to "assist him in taking care of his business interests for so long as he may live, to the very best of my ability." We have already described Mr. Steele's business and the work that the plaintiff did for him at his request and under his direction. The services of a stenographer are pretty generally well understood, and while the undertaking of the plaintiff to serve as Mr. Steele's "assistant business manager" may lack some precision of scope, there is no evidence here that the parties ever had any misunderstanding as to what the plaintiff was supposed to do. See Hastings Industrial Co. v. Copeland, supra, 114 Ark. 415, 418, 419, 169 S.W. 1185; and Shibley v. White, 193 Ark. 1048, 1052, 104 S.W.2d 461.

▇▇▇ Another position taken by the defendant is that the agreement was tainted with legal fraud in that the plaintiff at the time the contract was made was, and for a number of years prior thereto had been, the "clerk and secretary" employed by the deceased's attorneys, that a fiduciary relationship existed between them and the deceased, and that the plaintiff "while serving as clerk and secretary for Messrs. Denman and Denman was a fiduciary to the ex-

tent that the claim of the plaintiff is based upon an instrument which is constructively fraudulent; that by reason of this relationship of the parties, and by reason of Messrs. Denman and Denman being designated as beneficiaries within the express terms of the purported contract, the agreement is invalid and unenforceable." And the defendant also contends that the contract was so unfair and oppressive as to render it invalid, or at least to preclude the plaintiff from obtaining the equitable relief of specific performance.

■ It is, of course, true in Arkansas, as elsewhere, that the relationship between an attorney and his client is in the highest degree fiduciary, and that transactions between them will be scrutinized with great care to see that they are free from fraud, oppression, or abuse of the confidential relationship. And it may be conceded that situations may arise in which the rule governing contracts between attorney and client would be applicable to transactions between the former's secretary and the client. But this is not such a case.

Here, the plaintiff was not acting as the deceased's legal adviser, nor was she acting for her principal employers, but solely on her own account; nor is there any indication here that by virtue of her employment by Denman & Denman she had gained any influence or ascendancy over Mr. Steele, or that she possessed, as a result of her principal employment, any peculiar knowledge of his business or affairs, or that the personal relations between them were such that they should not be considered as having dealt at arm's length with respect to this agreement. The provision in the contract to the effect that after Mr. Steele's death the plaintiff should employ Denman & Denman was no part of the moving consideration for the agreement, but was purely incidental to the main purpose of the parties. Further, it was entirely contingent upon plaintiff's continuing to perform services for the estate "at a reasonable salary to be agreed upon,"

and was further contingent upon the estate needing legal services and upon Messrs. Denman & Denman being available to perform the same.

We see nothing out of the ordinary or suspicious in a man in Mr. Steele's circumstances and in need of secretarial assistance employing for that purpose the regular secretary of the law firm, located in one of the smaller Arkansas cities, which had represented him for a number of years; nor do we think it other than natural for the parties to specify that if the estate should need legal representation, such firm would be the first choice if its services were available.

The particular contention now under consideration was not formally briefed by counsel for the defendant; they did, however, in a letter to the Court, dated April 18, 1957, call to our attention without discussion certain authorities claimed to support their argument that the relationship between the plaintiff and deceased was a fiduciary one. In that letter our attention was called to the statement in 5 Am.Jur. "Attorney & Client," Section 50, p. 289, footnote 9, to the effect that a conveyance to a third person with whom the attorney is interested falls within the rule invoked by counsel, which statement is supported by a citation to Miles v. Ervin, 6 S.C.Eq., 1 McCord, 524, 16 Am.Dec. 623, which we have read and which is clearly not in point. Our attention was also called to Tate v. Williamson, L.R. 1 Eq. 528, Ch. 55, an English case which is not available to us, wherein, according to the defendant's abstract, it was held that the rule extends even to a friend who has assumed to advise in legal matters, and thus to take the place of an attorney. That case is likewise not in point since there is no evidence here that the plaintiff ever undertook to give the deceased any legal advice or to take the place of an attorney in dealing with him. We are also cited to the general statement found in 3 Pomeroy's Equity Jurisprudence (5th Ed.) p. 838, footnote 6,

to the effect that the "clerk" of an attorney has been held to be within the rule which applies between attorney and client. In that footnote Professor Pomeroy cites three English cases, likewise unavailable to us, and one American case, namely, Nesbit v. Lockman, 34 N.Y. 167, which we have read, and find that the facts therein do not resemble those presented here.[6] As we have said, we do not quarrel with the proposition that under certain circumstances the obligations of an attorney's secretary to a client may be the same as those of her employer, we simply do not think that said proposition is applicable here.

Regardless, however, of the relationship between the plaintiff and the deceased, the former would not be entitled to specific performance of her agreement if, as the defendant contends, to grant such relief would be inequitable or improper, and in that connection the defendant argues that the contract is grossly unfair and oppressive and should not be specifically enforced. Again, we cannot agree.

The general principles of Arkansas law governing the granting or withholding of the remedy of specific performance are well settled and may be briefly stated:

While the granting of specific relief rests within the discretion of the Court, such discretion is not an arbitrary one, but, rather, a judicial discretion to be exercised in the light of accepted principles of equity and with due regard to the circumstances of each particular case. Generally, where a contract involving lands is otherwise unobjectionable, a court of equity will decree specific performance thereof as a matter of course without regard to the adequacy or inadequacy of legal remedy. Hamilton v. Fowlkes, 16 Ark. 340; Shields v. Trammell, 19 Ark. 51; Dollar v. Knight,

145 Ark. 522, 224 S.W. 983; Dickinson v. McKenzie, 197 Ark. 746, 126 S.W.2d 95. The court, however, reserves the right to refuse specific performance in the exercise of its sound discretion " ' * * * where the case is not clear, or where the complainant is in the wrong, or there are considerable countervailing equities * * * ' " Cole v. Salyers, 190 Ark. 53, 57, 76 S.W.2d 669, 671; see also Robinson v. Florence Sanitarium, 149 Ark. 355, 232 S.W. 590.

In Shields v. Trammell, supra, 19 Ark. 51, 59–60, it was held that in order for a contract to be specifically enforced it must appear: 1. That there was a valuable consideration. 2. That enforcement is practicable. 3. That specific performance is really important to the plaintiff and not oppressive on the defendant. That case was cited with approval in Greenfield v. Carton, 30 Ark. 547.

While in Hamilton v. Fowlkes, supra, 16 Ark. 340, 367, the Court stated that "adequacy of consideration" is one of the prerequisites to specific performance, the Court went on to say that by an "adequate consideration" is meant "a valuable, or at least a meritorious consideration, for courts of equity will not carry into specific execution any merely *nude pacts* or *voluntary* agreements, not founded upon some valuable or meritorious consideration." And in Morrison v. Peay, 21 Ark. 110, the Court disposed of the contention that specific performance should be denied because the bargain was unconscionable and the enforcement of it would be inequitable under the existing circumstances in the following language:

"The parties were fully competent to contract with each other— the contract was fairly made, without fraud or mistake, was upon good consideration, its terms clear-

---

6. We have never been entirely sure of the significance that the defendant undertakes to place upon the word "clerk," as applied to the plaintiff. If by the use of such term the defendant seeks to imply that Mrs. McCargo's position with Denman & Denman was something more than that of an ordinary legal stenographer or secretary, it should be said that there was no evidence which would support such an implication.

ly proven, and it unattended with any circumstances which would make its enforcement inequitable. The only objection urged is, that the lands were not leased on terms sufficiently advantageous to the bank. This was a matter for the judgment of the trustees, who, it must be supposed, had capacity to transact business. No doubt they thought, at the time the contract was made, that it was for the best—but if experience has shown that the bank has realized less than it might have realized, it is surely no reason why the contract should not be faithfully performed by both parties. The objection, viewed in the most favorable light, amounts to a mere naked hardness of bargain; and, to sanction it would be to make a bad bargain a good excuse for bad faith. No court has ever gone as far as that—especially when, as in the case before us, it would enable the party urging the objection, to practice a fraud on the party seeking to enforce the contract." 21 Ark. at pages 116–117.

Hamilton v. Fowlkes and Morrison v. Peay, while old cases, have never been overruled or criticized; and, in our estimation, they align Arkansas with the weight of authority which is to the effect that mere inadequacy of consideration, standing alone, is not sufficient to justify a refusal of specific performance. See annotation appearing in 65 A.L.R. 7, 86 et seq., wherein it is said: "According to this rule, merely to show a disproportion between the value of the subject-matter of a contract and the consideration therefor is not sufficient to authorize the court to deny the specific enforcement of the contract. In harmony with this view, mere inadequacy of consideration has been held to be insufficient ground upon which to deny to one of the parties to a contract his right to a specific performance, where, in other respects, the contract conforms with the rules and principles of equity." 65 A.L.R. at page 86. That Arkansas will deny specific performance where a grossly inadequate consideration is accompanied by harsh dealing or overreaching, or where the whole transaction is tainted with illegality is made clear by the decision in Millsaps v. Strauss, 208 Ark. 265, 185 S.W.2d 933.

There is no indication in the instant case that the contract was procured by any fraud, misrepresentation, or overreaching, and when it is viewed in the light of the principles just stated, and with due regard to the situation and circumstances of the parties at the time, we are satisfied that it was not unjust, unfair or inequitable so as to require us to declare it invalid or to deny specific performance thereof, and we so find.

As heretofore stated, the contract was entered into between competent parties fully capable of protecting their respective interests, and the ends of the agreement were perfectly legitimate. Mr. Steele was in need of clerical assistance in his business, and he elected to employ the plaintiff to furnish that assistance, and he agreed to compensate her by settling upon her, in the event that she survived him, an interest in such Nevada County property as he might own at the time of his death. The plaintiff agreed to work for Mr. Steele on those terms, and, as we have found, she did work for him pursuant to the contract up until the time of his death. Moreover, while we recognize that past consideration is not alone sufficient to sustain a contract or to justify its specific performance, still where, as here, a court of equity is concerned with the fairness and reasonableness of a contract, past consideration expressly recognized by the promisor as an inducement for his undertaking, should not be overlooked.

Due, at least in part, to the dead man's statute we do not know the nature and extent of the past services referred to in the agreement, and we do not know the precise extent and value of the services that the plaintiff per-

formed after the contract was made. But Mr. Steele presumably knew what the plaintiff had done for him in the past, and he also presumably knew what he expected of her in the future; and in the exercise of his own judgment he felt that what she had done and what she was to undertake to do in the future constituted a sufficient consideration for his agreement. As pointed out in Morrison v. Peay, supra, 21 Ark. 110, that was a question for him to decide; and for us to disturb his determination at the behest of his legatee so as to deny specific performance would be to indulge in a judicial paternalism not warranted by the facts of this case. After all, among the foundation stones of American law and American liberty are an individual's right to deal with his property as he sees fit, whether his dealings be wise or unwise, and the sanctity of contracts. As was said in a slightly different context in the landmark case of Kelly's Heirs v. McGuire, 15 Ark. 555, 598, "If a contract is freely and understandingly executed by a party with full knowledge of his rights, and of the consequences of the act, it must stand. This court disclaims all jurisdiction to interfere on account of improvidence or folly of an act done by a person of sound * * * mind."

Even if it be conceded that, as things have turned out, the plaintiff is to be liberally rewarded for her services, we see nothing unconscionable in the transaction. As has been said, Mr. Steele was never married and left no widow or direct descendants to lay claim to his bounty, and we know nothing of his actual relations with the defendant, except what can be inferred from the fact that he made a will in her favor. On the other hand, Mrs. McCargo had served him in the past and had agreed to serve him for the rest of his life, and it seems to us that he desired to reward her liberally, as he had a right to do. Hence, unless we are to say that he intended to make a purely illusory promise, to deny specific performance to the plaintiff would be to frustrate his purpose as well as to deprive her of the fruits of her performance. This contract was no burden on the deceased while he was alive, nor did it deprive him of the control of his property or of the enjoyment of the income therefrom, and to specifically enforce it cannot be a burden or a hardship to him now. As a matter of fact, it will be no burden on his sister, except in the sense that she will now take three-fourths of his Nevada County property instead of all of it. On this phase of the case it is well to keep in mind that "property is of no value to a dead man, and when the rights of third persons do not intervene a man should be allowed to obtain what he needs most while living by giving up that which will be of no use to him at the time he parts with it." 57 Am.Jur. "Wills," Section 168.

The defendant next argues that the contract is lacking in mutuality of remedy and for that reason should not be specifically enforced. Had this action been brought during the lifetime of Mr. Steele, the defendant's position would have been unquestionably well taken because he could not have compelled her to perform the personal services which she agreed to perform. Hall v. Milham, supra, 225 Ark. 597, 284 S. W.2d 108. As stated, however, it is a well settled principle of Arkansas law that a contract to make a will will be specifically enforced where the promisee has fully performed his obligations, and that rule was recognized in Hall v. Milham, just cited. Hence, since we find that the plaintiff did in fact fully perform under the contract, it becomes immaterial that she could not have been compelled to perform during the deceased's lifetime. In reaching this conclusion we do not overlook the fact that plaintiff has not performed any services for the estate since Mr. Steele's death, nor is there any showing that she has ever offered to do so. But it will be noted that her obligations after the death of the deceased were contingent upon satisfactory salary arrangements being made, and, furthermore, we have

seen that the executrix repudiated the contract in its entirety, and has never recognized it as valid. More than that, according to the testimony of Mr. Wilson, Mr. Steele made arrangements for the former to assist in the management of the estate after his death, and those transactions had the effect, in our estimation, of excusing Mrs. McCargo from performance after Mr. Steele's death.

From the foregoing discussion it follows that the contract was valid when made, and having so concluded, it now becomes necessary to consider whether or not there was a subsequent failure of consideration, or a mutual rescission and abandonment, and whether or not the plaintiff has been guilty of laches which precludes her from relief. All of those questions are closely related to each other and will be discussed together.

In support of her contentions now to be taken up, the defendant relies upon the execution of the will which has been described, which instrument was witnessed by the plaintiff, the alleged employment of a substitute to do the work that the plaintiff agreed to do, the fact that checks were given to the plaintiff some of which recited that they were drawn in payment for services rendered, the alleged failure of the plaintiff to take any steps to protect her rights during the deceased's lifetime, her failure to perform or to offer to perform any services for the estate after Mr. Steele died, and her alleged delay in bringing her contract to the attention of the defendant.

In passing upon those contentions we recognize, of course, that parties who are capable of making a contract are also capable of mutually rescinding and abandoning it, Haering Oil Co., Inc., v. Beasley, 221 Ark. 607, 254 S.W.2d 951, and cases there cited; on the other hand, one who for a valuable consideration contracts to make a disposition of his property in favor of another cannot escape his obligations by a unilateral repudiation thereof, unless the conduct of the promisee is such as to amount to a waiver, abandonment or estoppel. See Naylor v. Shelton, supra, 102 Ark. 30, 143 S.W. 117. And it is also well to keep in mind that repudiation or abandonment of valuable contractual rights is contrary to the habits of mankind and "must be made to appear clearly, and no such result follows unless the promisee, with a full knowledge of all the material facts, does or forbears the doing of something inconsistent with the right or with an intention to rely on it." 94 C.J.S. Wills § 121. Whether or not there has been an effective loss of rights in this manner is usually a question of fact. Ibid.

As far as the will is concerned, assuming for purposes of argument that it was from a legal standpoint in derogation of the contract, it does not necessarily follow that either the plaintiff or the testator appreciated such fact or had any intention of impairing the former's contractual rights. First, it will be recalled that the parties contemplated the execution of one or more assignments in favor of the plaintiff, and had the same been executed, and had they taken a valid form, the plaintiff's interest might never have become a part of the deceased's residuary estate and might not have been affected by the will, or at least the parties could well have so supposed. Secondly, the will provided for the payment of the testator's just debts, and the parties could have felt that such provision adequately protected the plaintiff's rights; that the plaintiff felt such to be the case is indicated, at least to some extent, by the fact that she commenced these proceedings by filing a claim against the estate. Moreover, there is no showing here that there was any change of conditions between March 15, the date of the contract, and April 26, 1954, when the will was made, which would have prompted the parties to rescind the agreement, and the question arises as to why if the contract was to be rescinded in so short a time, it was ever made to begin with.

In addition to the foregoing, if the parties had agreed to a rescission, it is

almost inconceivable that Mr. Steele, an experienced business man, would have chosen to express such an agreement by the indirect method of executing a will in conflict with the contract and having the plaintiff witness it. Rather, it seems to us that he would have taken care to have the agreement of rescission definitely expressed in a more appropriate manner, particularly in view of the fact that the contract obligated him to pay the plaintiff's daughter $25,000 if the plaintiff should predecease him, a contingency that might have easily taken place.

As to the hiring of Mr. Savage, we have already pointed out that he was hired as a bookkeeper, which the plaintiff was not, and that his work did not conflict with or overlap hers. Mrs. McCargo continued to do the work that she was supposed to do, and the fact that the deceased employed someone else to do other work certainly does not indicate any mutual rescission of the plaintiff's contract or any abandonment by her of her rights thereunder.

As far as Mr. Steele's arrangements with Mr. Wilson to help his sister look after the estate are concerned, we have already stated that there is no evidence that the plaintiff knew of those arrangements prior to the deceased's death, and we do not think that said arrangements necessarily indicate any intention on Mr. Steele's part to renounce his obligations to the plaintiff. Actually, in view of the contingent nature of the plaintiff's obligations after Mr. Steele's death, we are of the opinion that it was the intention of the parties that her rights under the contract should vest upon his death, and that they simply contemplated the possibility or the desirability of her making further arrangements with his successors after he was dead. In view of the defendant's attitude toward the contract in suit, it seems rather obvious that she would not have accepted the plaintiff's services after her brother's death, and that any negotiations for a new contract which the plaintiff might have undertaken would have been futile.

While the checks that have been mentioned unquestionably evidence that the plaintiff received some compensation for at least some of the work that she did after the contract was made, they are insufficient, in our eyes, to show any mutual rescission of the agreement or any abandonment by the plaintiff of her rights thereunder. The twelve checks upon which the defendant relies totalled $395, of which sum $165, was represented by checks bearing no notation at all; it cannot be said that those checks were necessarily given as compensation for services, particularly in view of the fact that the contract required the deceased to pay the plaintiff's gasoline and oil expenses while she was looking after his business prior to the execution of the contemplated "assignments." Of the checks representing the remaining $230, two for fifty dollars each recited that they were given for "extra work" or "extra labor," which would indicate that they constituted compensation for work over and above what the plaintiff was normally expected to do. As to the remaining checks bearing notations, four in number, totalling $130, only one, dated June 6, 1955, in the sum of $100 bears an unequivocal notation that it was given for "services"; the remaining three, each in the sum of $10, simply refer to certain "affidavits" or "papers," and we cannot tell whether they constituted payments for drawing such documents or whether they were for other expenses incurred in connection therewith.

But assuming that the entire $395 evidenced by the checks constituted compensation for services, we cannot find that they establish any rescission by the parties or abandonment by the plaintiff of a contract under which she was to receive a substantial interest in Mr. Steele's Nevada County property should she outlive him, and under which he was to pay her daughter $25,000 should she die first. We cannot say that this $395 was reasonable compensation for the services rendered after the contract was made, or that they related to all of such services performed, and we are certainly

unable to say that they represented compensation for the past services referred to in the contract. There is no evidence that Mrs. McCargo had any reason to forego her rights under the contract in consideration of $395, evidenced by twelve checks in varying amounts issued over a period extending from June, 1954 down to January, 1956, and it would have been highly unusual for her to have done so.

But regardless of what may be said about the will, or about the hiring of Mr. Savage, or about the arrangements with Mr. Wilson, or about the checks, the best evidence of the parties' attitude toward the status of the contract is to be found in Mr. Steele's two re-publications of that instrument in the plaintiff's presence, which have already been described. Those acts and declarations, in our estimation, clearly show that less than a month before his death both he and she considered the contract as being in full force and effect, and it might be pointed out that the final check drawn by the deceased in the plaintiff's favor, which is dated January 12, 1956, after the re-publications that have been mentioned, bore no notation at all.

Counsel for the defendant do not attempt to reconcile the testimony of Mr. Franks and Mrs. Husky with their theory of rescission and abandonment; they simply ask us to disbelieve that testimony in its entirety as being "incredible." This we cannot do. Neither of those witnesses was impeached in any manner by the defendant, or by their manner or demeanor while testifying. Both of them are people of substance in Prescott, and while they are friends of the plaintiff, there is nothing to indicate that they have any interest in this lawsuit, and there is nothing to suggest that their friendship with the plaintiff is such as to induce them to perjure themselves in her behalf.

While there are some phases of the testimony of Mrs. Husky and Mr. Franks that might have been clarified to some extent, we cannot agree with the defendant that their testimony describes "irrational conduct on the part of the parties involved." We have already pointed out one possible reason why Mr. Steele had the plaintiff show her contract to Mrs. Husky, and while we do not know why Mr. Steele wanted to borrow money from Mrs. Husky rather than from the bank, he might easily have had personal reasons for not approaching the bank, or his credit there may well have been extended to its limit at that time. Again, we do not know why the parties waited from March, 1954 to December, 1955 to undertake to acknowledge the agreement before a notary public, but it may have been that up until that time they did not feel that there was any necessity for such an acknowledgment. The defendant raises certain other questions as to the truth of this testimony, which we do not deem it necessary to discuss since they are not, in our eyes, of sufficient importance to cause us to discredit the direct and positive testimony of these witnesses.

It is true that the plaintiff waited a considerable time after Mr. Steele's death to present her contract, but it does not appear that the estate was prejudiced in any way by that delay, and the presentation was made and the claim later filed within the statutory period. The delay here involved does not in any way approach that which was present in Lacey v. Bennett, 210 Ark. 277, 195 S.W.2d 341, cited by the defendant, and we do not attach controlling importance to it.

In summary, we find and conclude that the contract in suit was and is valid and subject to specific enforcement, that the plaintiff fully performed her obligations under it, that there was no failure of consideration, rescission or abandonment thereof, and that the plaintiff has not been guilty of any laches, and is entitled to the relief which she seeks.

Let a decree in accordance with the foregoing be entered.